[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 16, 2002
THOMAS K. KAHN
CLERK

No. 01-13057

_____

D. C. Docket No. 00-00021 CR-0C-10

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES SCOTT PENDERGRAFT,
MICHAEL SPIELVOGEL,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 16, 2002)**

Before TJOFLAT, RONEY and COX, Circuit Judges.

COX, Circuit Judge:

James Scott Pendergraft and Michael Spielvogel were convicted, following a jury trial, for (1) attempted extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951, (2) mail fraud, in violation of 18 U.S.C. § 1341, and (3) conspiracy to commit extortion, mail fraud, and perjury, in violation of 18 U.S.C. § 371. Spielvogel was also convicted of filing a false affidavit, in violation of 18 U.S.C. § 1623, and making a false statement to the Federal Bureau of Investigation, in violation of 18 U.S.C. § 1001. Pendergraft and Spielvogel appeal, challenging their convictions and sentences.

The charges against Pendergraft and Spielvogel arose out of their threat to seek damages in a lawsuit against Marion County, Florida, and to use false evidence in support of the lawsuit. Because we conclude that their threat was neither "wrongful" within the meaning of the Hobbs Act nor a "scheme to defraud" within the meaning of the mail-fraud statute, we reverse the attempted extortion and mail-fraud convictions, and we vacate the conspiracy convictions. However, we affirm Spielvogel's convictions for perjury and making false statements.

2

# I. BACKGROUND

## A. FACTS

Pendergraft is a physician specializing in maternal-fetal medicine.[1] As part of his practice, he performs abortions, including late-term, or "partial-birth," abortions. He opened the Orlando Women's Center in Orlando, Florida, in 1996. In 1997, seeking to expand his Florida practice, Pendergraft purchased a medical building in Ocala, Florida, for about $200,000.

Ocala is the county seat of Marion County. In 1989, an abortion clinic in Ocala, the All Women's Health Center, was destroyed by an arsonist, and Ocala had not had an abortion clinic since. Pendergraft had performed many abortions on Ocala residents in his Orlando clinic and believed he could profit by opening a clinic in Ocala.

Pendergraft's presence in Ocala sparked a lot of controversy. During a meeting of the Marion County Board of Commissioners in October 1997, Steve Klein, a resident of Ocala, proposed that the Board write a letter to Pendergraft asking him to reconsider opening his Ocala clinic. The Board unanimously supported Klein's proposal, and Larry Cretul, the Chairman of the Board, wrote and signed the letter and

---

[1]Because we are determining whether the actions of Pendergraft and Spielvogel are legally sufficient to support their convictions, we state the evidence in the light most favorable to the Government.

sent it to Pendergraft. The letter asked Pendergraft to reconsider his plans because of the controversy the clinic would bring to Ocala. Pendergraft received many other letters from concerned citizens of Marion County.

Pendergraft received the Board's letter and, after a few days, showed it to Michael Spielvogel, a business associate whose wife, Mary, worked for Pendergraft as an office administrator. In late October, Spielvogel called Cretul to discuss the possibility of Pendergraft withdrawing from Ocala if the County would purchase the clinic building for a good price.

Immediately after his discussion with Spielvogel, Cretul called the county sheriff's office and expressed some concern that he was being asked to pay for peace. The sheriff's office relayed Cretul's concern to FBI Special Agent Pamela Piersanti, and the FBI opened an investigation. As part of the investigation, the FBI recorded Cretul's subsequent conversations with Spielvogel. During one of the conversations, Spielvogel implied that Pendergraft would sell the clinic building for between $350,000 and $500,000.

On January 29, 1998, a bomb exploded at the New Woman All Women Health Care Center, an abortion clinic in Birmingham, Alabama, killing an off-duty police officer and injuring a chief nurse. That evening, Cretul and Spielvogel spoke by telephone. Following their conversation, Spielvogel called the FBI and reported that

4

Cretul had threatened him. Specifically, Spielvogel reported that Cretul had said that the Alabama bombing was nothing compared to what would happen to the Ocala clinic. Because the FBI was monitoring Cretul's conversations with Spielvogel, it knew that Spielvogel's allegation was false. The FBI declined to investigate the alleged threat and told Spielvogel of its declination in late February.

On February 24, Pendergraft wrote identical letters to Cretul and several other Ocala citizens who had previously written letters to Pendergraft. In this letter, Pendergraft articulated his reasons for opening the Ocala clinic and acknowledged that he would perform abortions. At the end of his letter, he intimated that he would entertain other plans for the facility, including a sale of it, and asked potential offerors to contact Spielvogel.

At the FBI's request, Cretul called Pendergraft and finally got in touch with him on March 26, 1998. Cretul told Pendergraft that he was worried about the potential controversy and violence that the Ocala clinic would bring, but Pendergraft denied that he wanted or caused violence. Cretul asked Pendergraft how much money it would take to keep him out of Ocala. Pendergraft said that he would stay away three years for $550,000, five years for $750,000, and forever for $1,000,000. Cretul told Pendergraft that his offer felt like extortion, but Pendergraft denied any such intent

and offered to cease negotiations. On April 8, the FBI told Cretul to call off negotiations, and thereafter the investigation of Pendergraft was closed.

In July 1998, the Ocala clinic opened amid much controversy. Protestors consistently blocked the driveway to the clinic and harassed those who entered the building. Pendergraft asked the City of Ocala and the Marion County Sheriff's Department if he could hire off-duty law enforcement officers to protect his clinic. Though such requests were routinely granted to other businesses, Pendergraft's request was denied.

Pendergraft and the Ocala Women's Center filed a federal lawsuit in December 1998, naming Marion County, the City of Ocala, and several individual protestors as defendants. It sought injunctive relief against Marion County that would permit Pendergraft to hire off-duty law enforcement officers.

Marion County retained Virgil Wright to defend the suit. Wright contacted Roy Lucas, Pendergraft's lawyer, and told Lucas that, since the Sheriff's Department was not controlled by Marion County, Marion County should not be a party to the suit. Lucas responded on March 15, 1999, with a letter stating that Cretul's threats, as reported by Spielvogel, violated the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, and exposed the County to actual and punitive damages as well as litigation fees and expenses. Lucas threatened to file an amended complaint that

would seek damages against the County and add Spielvogel, Spielvogel's wife, and the Ocala clinic administrator as plaintiffs. Attached to the letter were two unsigned affidavits, one by Spielvogel and one by Pendergraft.

Spielvogel's affidavit reported Cretul's threat and said that Pendergraft witnessed Spielvogel's reaction to the threat when it was made. Pendergraft's affidavit said that he believed Spielvogel's report that Cretul made threats because of Spielvogel's reaction when he was on the phone with Cretul.

When Wright received Lucas's letter, he contacted Cretul, who told Wright that the FBI taped the phone call during which Cretul was alleged to have made the threat. Wright agreed to assist the FBI in the investigation of Pendergraft and Spielvogel by holding a settlement conference with them. Wright and Lucas agreed to hold a settlement conference on March 22. In a letter confirming the time the conference was scheduled, Lucas said that he would bring a copy of a proposed amended complaint but that he might not need to file it, depending on the discussion.

On March 19, Pendergraft and Spielvogel filed a motion for partial summary judgment in their federal lawsuit. The motion sought to enjoin the protestors from harming clinic workers and to allow Pendergraft to hire off-duty officers. In support of the motion, Pendergraft and Spielvogel filed, among other things, the affidavits

they sent to Wright regarding Cretul's threats. These affidavits were signed, dated, and notarized. Pendergraft and Spielvogel mailed a copy of this motion to Wright.

On March 22, Wright, Lucas, Spielvogel, and Pendergraft attended the settlement conference, and the FBI captured it on videotape. At the conference, Spielvogel again asserted that Cretul had threatened him, and Pendergraft claimed that he was present when Spielvogel received the threatening phone call. While Spielvogel expressed his desire for an immediate settlement, Pendergraft made it clear that he wanted to go to trial. Lucas and Pendergraft informed Wright that the lawsuit could bankrupt Marion County based on prior verdicts in similar cases. Wright told them he would report to Marion County and ask the county what it would like to do.

On April 12, Piersanti, the FBI agent, confronted Spielvogel with evidence that his allegations against Cretul were false, and she asked Spielvogel to cooperate in an investigation of Pendergraft. Spielvogel declined this offer and instead informed Pendergraft of the investigation.

On August 4, 1999, an amended complaint was filed in Pendergraft's lawsuit. It did not add Spielvogel or his wife as plaintiffs. It did not add Larry Cretul as a defendant. Instead of adding a claim for damages against Marion County, it dropped Marion County from the suit entirely. Nevertheless, a grand jury investigation of Pendergraft and Spielvogel was initiated.

## B. PROCEDURAL HISTORY

### 1. The Indictment

On June 13, 2000, the grand jury indicted Pendergraft and Spielvogel. Count One charges that they conspired to commit extortion under 18 U.S.C. § 1951, perjury under 18 U.S.C. § 1623, and mail fraud under 18 U.S.C. § 1341.

Count Two charges Pendergraft and Spielvogel with the substantive offense of attempted extortion for using false affidavits and statements in an attempt to obtain a monetary settlement from Marion County. The indictment alleges that Pendergraft and Spielvogel authored false affidavits accusing Cretul of threatening them and attached these affidavits to a letter sent to Wright. Based on these false affidavits, they threatened, in the letter, to file an amended complaint seeking damages against Marion County. According to the indictment, they then arranged a settlement conference with Wright during which they threatened a multi-million dollar suit unless Marion County settled.

In Count Three, Pendergraft and Spielvogel are charged with mail fraud. Their alleged scheme to defraud was the use of false statements about Cretul's threats to obtain a settlement from Marion County. In furtherance of this scheme, they mailed copies of their motion for partial summary judgment, to which the allegedly false affidavits were attached, to Wright and other lawyers in the civil case.

Counts Four and Five charge only Spielvogel with perjury and making a false statement to the FBI. These charges arose out of Spielvogel's accusation, which he included both in his affidavit and in his report to the FBI, that Cretul threatened the Ocala clinic while on the phone with him.

### 2. *Motion to Dismiss the Indictment*

Pendergraft and Spielvogel filed a consolidated motion to dismiss the indictment on several grounds. (R.1-26.) They argued, among other things, that Counts One, Two, and Three of the indictment violated Pendergraft's First and Fourteenth Amendment rights. Because he had a right to assert claims against the government, he and Spielvogel could not be charged with extortion for their actions in connection with a lawsuit against the government. Furthermore, they argued, the indictment imperiled the privacy rights of Pendergraft and his patients because it endangered Pendergraft's ability to provide abortions.

Pendergraft and Spielvogel further argued that Counts One, Two, and Three were legally insufficient because a threat to file a lawsuit could never amount to extortion. They relied primarily on *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir. 1984), where the Eighth Circuit held that a threat to sue, even if groundless and in bad faith, could not constitute extortion.

The district court declined to dismiss any of the counts, noting that the indictment tracked the statutory language. (R.1-32.)

### 3. Motions for Judgment of Acquittal

The case ultimately went to trial. At the close of the Government's case, Pendergraft and Spielvogel made an oral motion for judgment of acquittal. (R.25 at 128-71.) They argued, among other things, that their litigation activities did not constitute extortion for purposes of the Hobbs Act, that the evidence failed to demonstrate a conspiratorial agreement between Pendergraft and Spielvogel, and that there was no "scheme to defraud" for purposes of the mail-fraud statute. The court denied the motion, and Pendergraft filed a renewed motion in written form. (R.3-99.)

Both Pendergraft and Spielvogel testified in their own defense. Spielvogel admitted, on the stand, that he lied, both in his affidavit and to the FBI, about the content of Cretul's threats. (R.18 at 76-77.) He also testified that he staged the phone call about which Pendergraft testified in his affidavit and that Pendergraft did not find out about it until just before the trial. (R.18 at 78-82.) Pendergraft testified that he witnessed the staged phone call but did not, at that time, know it was staged. (R.17 at 145-46; R.15 at 8-10.) On cross-examination, the Government elicited testimony suggesting that Pendergraft did not, in fact, witness the staged phone call when he said he did. (R.15 at 70-76.) At the close of all the evidence, the court deemed as restated

11

all motions for judgment of acquittal made during the trial and denied them all. (R.19 at 401-06.)

During closing argument, the Government focused on the credibility of Pendergraft and Spielvogel. It argued that, because Pendergraft and Spielvogel were liars, the jury could conclude that they engaged in the conduct alleged in the indictment. The jury convicted them as charged on every count.

After the verdict, Pendergraft and Spielvogel filed separate renewed motions for judgment of acquittal or, in the alternative, for a new trial. In addition to the grounds raised previously, they argued that the prosecutor had made improper statements in his closing arguments, including his statement that Pendergraft "shucked and jived" on the witness stand.

The district court summarily denied the renewed motions for judgment of acquittal and refused to grant a new trial. (R.4-140.) Pendergraft was sentenced to 46 months in prison and two years of supervised release. He was also fined $25,000. Spielvogel was sentenced to 41 months in prison and three years of supervised release. He was not fined.

## II.  ISSUES ON APPEAL

Pendergraft and Spielvogel raise the following issues on appeal:[2] (1) whether the district court erred by denying their motion to dismiss the indictment and their motions for judgment of acquittal because the conduct at issue was legally insufficient to support convictions for extortion or mail fraud; (2) whether the district court erred by denying their motions for judgment of acquittal because there was insufficient evidence of an illegal conspiracy; (3) whether the district court erred by denying their motions for a new trial because the prosecutor introduced racial prejudice by accusing Pendergraft of "shucking and jiving."[3]

## III.  STANDARDS OF REVIEW

---

[2]We have recharacterized some of the issues to focus on the rulings we are asked to review.

[3]Pendergraft also raises the following issues on appeal: (1) whether the district court erred by denying his motion for a judgment of acquittal because there was evidence that he believed he had a valid claim-of-right against Marion County; (2) whether the district court abused its discretion by admitting a tape of a civil-suit settlement conference; (3) whether the prosecutor improperly vouched for Government witnesses during closing argument; (4) whether the district court erred by enhancing his sentence for extortion based on a monetary demand that was outside the scope of the charged acts; and (5) whether, if a new trial is granted, the trial should be held outside of Ocala.  Spielvogel also raises one additional issue: whether the district court erred by precluding his diminished capacity defense.  We review each of these issues as well.

13

We review the district court's denial of a motion to dismiss the indictment for abuse of discretion, *see United States v. Pielago*, 135 F.3d 703, 707 (11th Cir. 1998), but the sufficiency of an indictment is a legal question that we review de novo. *See United States v. Steele*, 178 F.3d 1230, 1233 (11th Cir. 1999). We review the denial of a motion for judgment of acquittal de novo. *See United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001). In the absence of a contemporaneous objection, we review the district court's failure to correct an improper closing argument for plain error. *See United States v. Newton*, 44 F.3d 913, 920-21 (11th Cir. 1995). We review the denial of a motion for a new trial for abuse of discretion. *See United States v. Ward*, 274 F.3d 1320, 1323 (11th Cir. 2001).

### IV. DISCUSSION

### A. LEGAL SUFFICIENCY OF THE INDICTMENT

Pendergraft and Spielvogel assert error in the district court's denial of their motion to dismiss the indictment and their motions for judgment of acquittal. In their motions and on appeal, they challenge Counts One, Two, and Three on the ground that the extortion and mail-fraud charges are legally insufficient and that the Government failed to offer sufficient evidence of an illegal conspiracy. Because we conclude that there was evidence to support the extortion and mail-fraud allegations in the

14

indictment, we will examine those allegations to determine whether they are legally sufficient to charge an offense.[4]

## *1. Extortion (Counts One & Two)*

The Hobbs Act imposes criminal sanctions on those who affect interstate commerce by extortion. *See* 18 U.S.C. § 1951(a) (2000). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). In this case, the indictment alleges that Pendergraft and Spielvogel conspired to extort money from Marion County by threatening to file an amended complaint, supported by false affidavits, unless Marion County settled with them. Pendergraft and Spielvogel argue that such threats are not criminal under the Hobbs Act.

Several courts have held that a threat to file a lawsuit, even if made in bad faith, is not "wrongful" within the meaning of the Hobbs Act. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 547 (9th Cir. 1988); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267-68 (8th Cir. 1984); *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 259

---

[4]Only Spielvogel was charged in Counts Four and Five, and he does not challenge the legal sufficiency of these substantive counts.

15

(S.D.N.Y. 2001); *Heights Cmty. Cong. v. Smythe, Cramer Co.*, 862 F. Supp. 204, 207

(N.D. Ohio 1994); *Am. Nursing Care of Toledo, Inc. v. Leisure*, 609 F. Supp. 419, 430

(N.D. Ohio 1984). All of these cases have arisen in the civil RICO[5] context where

litigants have included a threat to file a lawsuit as the predicate act of extortion. By

rejecting such threats as predicate acts, these courts have implicitly held that threats

to sue cannot constitute criminal extortion. Most of these courts have recharacterized

the extortion charges as actions for malicious prosecution and have held that malicious

prosecution is not a RICO predicate act.

Because an action for malicious prosecution is a civil matter, we are reluctant

to recharacterize the criminal extortion charges in this case as actions for malicious

prosecution. Instead, we must analyze the Hobbs Act to determine whether it

criminalizes the bad-faith threat to sue that is alleged in this case.

We begin, of course, by examining the text of the statute. *See Adams v. Fla.*

*Power Corp.*, 255 F.3d 1322, 1324 (11th Cir. 2001). To commit extortion, a person's

actions must, in some sense, be "wrongful." *See* 18 U.S.C. § 1951(a) (2000). In

*United States v. Enmons*, 410 U.S. 396, 93 S. Ct. 1007 (1973), the Supreme Court

interpreted "wrongful," within the meaning of the Hobbs Act, to consist of using a

---

[5]RICO is an acronym for the Racketeer Influenced and Corrupt
Organizations Act, codified at 18 U.S.C. § 1961 et seq.

16

wrongful means to achieve a wrongful objective. *See id.* at 399-400, 93 S. Ct. at 1009.

To show a wrongful objective, the Government must show that Pendergraft and Spielvogel had no lawful claim to the money they sought. *See id.* at 400, 93 S. Ct. at 1009-10; *United States v. Nell,* 570 F.2d 1251, 1258 (5th Cir. 1978). Pendergraft and Spielvogel sought settlement money from Marion County based on threats allegedly made to Spielvogel by a county commissioner. The indictment alleges that these threats never actually occurred. This allegation, if true, shows that Pendergraft and Spielvogel had no lawful claim to the settlement money they sought. The wrongful-objective element of extortion is therefore satisfied.[6]

Regarding the wrongful-means element, the question presented is whether their threat to file the lawsuit was "wrongful." The indictment alleges that the defendants unlawfully used false affidavits and made false statements "in an effort to induce the payment of money by the Marion County government through the fear of economic loss." (R.1-1 at 7.) The use of fear can be a wrongful means under the Hobbs Act, and fear includes the fear of economic loss. But the fear of economic loss is an "animating force of our economic system," *United States v. Sturm,* 671 F. Supp. 79,

---

[6]Because the jury, from evidence introduced at trial, could have rejected Pendergraft's claim-of-right defense, he was not entitled to judgment of acquittal on the basis of his claim-of-right defense.

84 (D. Mass. 1987), *vacated and remanded*, 870 F.2d 769 (1st Cir. 1989), and, therefore, is not inherently wrongful. *See Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*, 726 F. Supp. 1083, 1095 (E.D. Mich. 1989). We must determine whether the use of economic fear in this case was "wrongful" within the meaning of the Hobbs Act.

The indictment alleges that Pendergraft and Spielvogel produced perjured affidavits that described threats by Larry Cretul, the Chairman of the Marion County Board of Commissioners. Based on the information in these affidavits, Pendergraft and Spielvogel threatened to amend an existing legitimate lawsuit to include a claim for damages against Marion County. The threat of this additional claim, backed by fabricated evidence, put Marion County in fear of economic loss, and Pendergraft and Spielvogel sought to exploit this fear by obtaining a settlement from Marion County. The bad-faith threat of litigation, according to the indictment, was reasonably calculated to cause fear of economic loss and therefore "wrongful."

A threat to litigate, by itself, is not necessarily "wrongful" within the meaning of the Hobbs Act. After all, under our system, parties are encouraged to resort to courts for the redress of wrongs and the enforcement of rights. *See Boothby Realty Co. v. Haygood*, 114 So. 2d 555, 559 (Ala. 1959); 54 C.J.S. *Malicious Prosecution* § 4 at 525 (1987). For this reason, litigants may be sanctioned for only the most frivolous of actions. These sanctions include tort actions for malicious prosecution

18

and abuse of process, and in some cases recovery of attorney's fees, but even these remedies are heavily disfavored because they discourage the resort to courts. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S. Ct. 1612, 1617 (1975); *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996); *Mims v. Teamsters Local No. 78*, 821 F.2d 1568, 1570 (11th Cir. 1987); *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 832 (Ala. 1999); *Cate v. Oldham*, 450 So. 2d 224, 225-26 (Fla. 1984); *Day Realty Assocs., Inc. v. McMillan*, 277 S.E.2d 663, 664 (Ga. 1981).

History has taught us that, if people take the law into their own hands, an endless cycle of violence can erupt, and we therefore encourage people to take their problems to court. We trust the courts, and their time-tested procedures, to produce reliable results, separating validity from invalidity, honesty from dishonesty. While our process is sometimes expensive, and occasionally inaccurate, we have confidence in it. When a citizen avails himself of this process, his doing so is not inherently "wrongful."

Moreover, in this case, we are not dealing with a typical threat to litigate. Instead, we are dealing with a threat to litigate against a county government. The right of citizens to petition their government for the redress of grievances is fundamental

to our constitutional structure. *See* U.S. Const. amend. I.[7] A threat to file suit against a government, then, cannot be "wrongful" in itself.

But, in this case, we have an allegation that Pendergraft and Spielvogel fabricated evidence to support their suit. The fabrication of evidence is certainly not "rightful." The question is whether the fabrication of evidence makes a threat to sue a government "wrongful."

We recognize that the fabrication of evidence is criminalized by the perjury statute. While the same conduct can violate several statutes, we do not think that Pendergraft and Spielvogel's conduct does. The law jealously guards witnesses who participate in judicial proceedings; witnesses should be "unafraid to testify fully and openly." *See Charles v. Wade*, 665 F.2d 661, 667 (5th Cir. Unit B 1982). Because the rigors of cross-examination and the penalty of perjury sufficiently protect the reliability of witnesses, *see Butz v. Economou*, 438 U.S. 478, 512, 98 S. Ct. 2894, 2914 (1978); *Charles*, 665 F.2d at 667, courts have been unwilling to expand the

---

[7]The State of Florida provides extra security for this right by forbidding state officials or state entities from suing citizens for malicious prosecution. *See Cate v. Oldham*, 450 So. 2d 224, 225-26 (Fla. 1984). In Florida's view, such suits "can only result in self-censorship. Potential critics of official conduct would be foreclosed from bringing suit because of doubt that they would be permitted to, or could prove the facts, or for fear of the expense for having failed to do so." *Id.* at 227 (quoting *Board of Education v. Marting*, 217 N.E.2d 712, 717 (Ohio Ct. Com. Pl. 1966)).

20

scope of witness liability, since, by doing so, "'the risk of self-censorship becomes too great.'"  *Charles*, 665 F.2d at 667 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 440, 96 S. Ct. 984, 999 (1976) (White, J., concurring).

Criminalizing false testimony via the Hobbs Act would expand the scope of witness liability.  Witnesses might decline to provide affidavits in questionable lawsuits against a government, fearing that they could be charged with conspiracy to commit extortion if the lawsuit fails.  Such a possibility is unsettling, and we do not believe that Congress intended to expand the scope of witness liability in this way.  The fabrication of evidence, then, does not make a threat to sue a government "wrongful" within the meaning of the Hobbs Act.

While the case before us involves a threat to sue a government, we are troubled by *any* use of this federal criminal statute to punish civil litigants.  Sanctions for filing lawsuits, such as malicious prosecution, lead to collateral disputes and "a piling of litigation on litigation without end."  *Boothby Realty Co.*, 114 So. 2d at 559.  Allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another.  The reality is that litigating parties often accuse each other of bad faith.  The prospect of such civil cases ending as criminal prosecutions gives us pause.

Moreover, this addition to the federal criminal arsenal would have other disconcerting implications in the civil arena. As we have noted, the cases rejecting extortion for threats to litigate arise in the civil RICO context when parties attempt to graft a RICO claim on their claims for malicious prosecution. In those cases, the courts express concern about transforming a state common-law action into a federal crime. We share this concern.

Nevertheless, our holding is a narrow one. We hold that Pendergraft and Spielvogel's threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not "wrongful" within the meaning of the Hobbs Act. Thus, we conclude that the allegations in the indictment for conspiracy to commit extortion and for the substantive offense of attempted extortion fail to charge offenses as a matter of law.

### 2. Mail Fraud (Counts One & Three)

The indictment also charges Pendergraft and Spielvogel with mail fraud and conspiracy to commit mail fraud. When Pendergraft and Spielvogel filed their motion for a preliminary injunction with the district court, they attached their false affidavits in support. A copy of the motion was served by mail on Marion County's attorney, Virgil Wright, and two other lawyers in the case. To commit mail fraud, a person must (1) intentionally participate in a scheme to defraud and (2) use the mails in

furtherance of the scheme. *See* 18 U.S.C. § 1341 (2000); *United States v. Smith*, 934 F.2d 270, 274 (11th Cir. 1991). The indictment alleges that Pendergraft and Spielvogel intentionally participated in a scheme to extort a monetary settlement from Marion County and mailed the motion with the attached false affidavits in furtherance of that scheme. Pendergraft and Spielvogel argue that their alleged scheme to obtain a settlement did not constitute a "scheme to defraud" for purposes of the mail fraud statute.

Serving a motion by mail is an ordinary litigation practice. A number of courts have considered whether serving litigation documents by mail can constitute mail fraud, and all have rejected that possibility. *See Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162-64 (D. Conn. 2000); *Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp. 2d 1291, 1300 (M.D. Ala. 1998); *Von Bulow v. Von Bulow*, 657 F. Supp. 1134, 1142-47 (S.D.N.Y. 1987); *Paul S. Mullin & Assocs., Inc. v. Bassett*, 632 F. Supp. 532, 540 (D. Del. 1986); *Am. Nursing Care of Toledo, Inc. v. Leisure*, 609 F. Supp. 419, 430 (N.D. Ohio 1984). As in the Hobbs Act context, these courts have rejected this mail-fraud theory on policy grounds, recognizing that such charges are merely "artfully pleaded claims for malicious prosecution." *Auburn Med. Ctr., Inc.*, 9 F. Supp. 2d at 1297. Again, prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system. Moreover, allowing such charges

23

would arguably turn many state-law actions for malicious prosecution into federal RICO actions.

But, as always, we are primarily concerned with the language of the statute, not its policy implications. While both the mail-fraud and wire-fraud statutes use the phrase "scheme to defraud," neither statute defines what a "scheme to defraud" is. *See Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941); *United States v. Lemire*, 720 F.2d 1327, 1335 (D.C. Cir. 1983). Instead, the meaning of "scheme to defraud" has been judicially defined. *See Lemire*, 720 F.2d at 1335. Courts have defined the phrase broadly, allowing it to encompass deceptive schemes that do not fit the common-law definition of fraud. *See Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 512 (1924); *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996). Nevertheless, Congress did not strip the word "defraud" of all its meaning, *see Brown*, 79 F.3d at 1557; the word still signifies "the deprivation of something of value by trick, deceit, chicane, or overreaching." *See Hammerschmidt*, 265 U.S. at 188, 44 S. Ct. at 512.

There are limits to the types of schemes that the mail-fraud statute encompasses. *See Brown*, 79 F.3d at 1556. Indeed, it has long been recognized that, "broad as are the words 'to defraud,' they do not include threat and coercion through fear or force." *Fasulo v. United States*, 272 U.S. 620, 628, 47 S. Ct. 200, 202 (1926); *see also*

*Hammerschmidt*, 265 U.S. at 188, 44 S. Ct. at 512 ("[The words 'to defraud'] do not extend to theft by violence."); *Naponiello v. United States*, 291 F. 1008, 1010 (7th Cir. 1923) ("[T]hreats which the victim believes will be carried into execution unless he acquiesces in the demands are not deceits."); *United States v. McKay*, 45 F. Supp. 1007, 1011 (E.D. Mich. 1942) ("[R]egardless of how broad an interpretation is put upon the words 'to defraud' they do not include threats and coercion through fear or force.")

In this case, the indictment alleges that Pendergraft and Spielvogel sought to extort money from Marion County by exploiting their fear of economic loss. This fear was caused by Pendergraft and Spielvogel's threat to sue and was aggravated by their production of false affidavits. Once Pendergraft and Spielvogel filed these documents with the court, as attachments to their motion for a preliminary injunction, and served Marion County with the motion, Marion County knew that their threats to lie were serious. The possibility of an unfavorable verdict, based on perjurious testimony, may have caused Marion County to fear the lawsuit. But fear is different from fraud. A scheme to frighten is simply not criminalized by the mail-fraud statute.

However, the use of fear does not immunize particular actions from mail-fraud charges; if deceit, as well as fear, is intended, then the actions may be criminal. *See Huff v. United States*, 301 F.2d 760, 765 (5th Cir. 1962). In support of their suit

25

against Marion County, Pendergraft and Spielvogel authored affidavits that falsely accused Cretul of making threats. Such falsity might have deceived some, but it could not deceive Marion County. Cretul, after all, was the Chairman of the Marion County Board of Commissioners, and Pendergraft and Spielvogel were aware of Cretul's position. They knew that Cretul would deny making these threats, and they knew that their affidavits would not trick Cretul into admitting otherwise. If they knew that they could not deceive Marion County, then they could not have had an intent to deceive. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir. 1991) ("A defendant cannot possibly intend to deceive someone if he does not believe that his intended 'victim' will act on his deception."); *Norton v. United States*, 92 F.2d 753, 755 (9th Cir. 1937) ("There can be no intent to deceive where it is known to the party making the representations that no deception can result.").

Since there was no intent to deceive, there was no "scheme to defraud," and we hold that Pendergraft and Spielvogel's mailing of litigation documents, even perjurious ones, did not violate the mail-fraud statute. The allegations in the indictment for conspiracy to commit mail fraud and for the substantive offense of mail fraud therefore fail to charge offenses as a matter of law.

### 3. Multiple-Object Conspiracy (Count One)

The indictment also alleges, in Count One, that Pendergraft and Spielvogel agreed to author perjured affidavits testifying to threats made by Cretul. They both, in fact, submitted affidavits: Spielvogel's claims that he received a threatening phone call in Pendergraft's presence, and Pendergraft's claims that he witnessed Spielvogel receiving the phone call. The indictment alleges that this threatening phone call never, in fact, occurred. These allegations, if true, can support a conviction for conspiracy to commit perjury.

However, in Count One, the indictment charges conspiracy to commit extortion and mail fraud along with conspiracy to commit perjury, and the jury returned a general verdict of guilty. When a jury returns a general verdict of guilty in a multiple-object conspiracy, the verdict may be set aside if one of the conspiracy theories is contrary to law. *See Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 474 (1991); *Yates v. United States*, 354 U.S. 298, 312, 77 S. Ct. 1064, 1073 (1957). Therefore, because two of the theories asserted in Count One, conspiracy to commit extortion and conspiracy to commit mail fraud, were legally insufficient, we vacate the conviction on Count One.

We must nevertheless determine what the disposition of Count One should be. If the Government presented sufficient evidence of a conspiracy to commit perjury, we must remand this charge for a new trial. However, if the Government failed to

27

present sufficient evidence, the constitutional prohibition against double jeopardy prevents a retrial on this charge. Therefore, we must determine whether the Government presented sufficient evidence of a conspiracy to commit perjury to support a conviction.

To prove a conspiracy, the Government must show (1) the existence of an agreement among two or more persons, (2) that the defendant knew the general purpose of the agreement; and (3) that the defendant knowingly and voluntarily participated in the agreement. *See United States v. Simpson*, 228 F.3d 1294, 1298 (11th Cir. 2000). In this case, the Government's conspiracy theory was that Pendergraft and Spielvogel agreed to author perjured affidavits to provide evidence in pursuit of a settlement with Marion County. These affidavits would state that Spielvogel received threats from Cretul over the telephone and that Pendergraft was present and observed Spielvogel's fear after receiving these threats.

When reviewing the sufficiency of the evidence, we are obligated to draw inferences in the Government's favor. *See United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994). While the Government presented no direct evidence of an agreement, there was circumstantial evidence from which a jury could infer an agreement.

During the Government's case, it introduced the affidavits and statements of Spielvogel and Pendergraft. These statements indicated that Cretul threatened Spielvogel on January 29 and that Pendergraft observed Spielvogel receiving these threats. The Government offered evidence that Cretul did not, in fact, make the threats on January 29. Cretul testified that he never made the threats asserted by Spielvogel, and, on the FBI tapes of Cretul's conversations with Spielvogel, Cretul never made the threats that Spielvogel asserted in his affidavit. This demonstrated that Spielvogel's statements were false. Furthermore, Spielvogel was at home when he spoke with Cretul on January 29. The Government and Pendergraft stipulated that Pendergraft was not at Spielvogel's home during Spielvogel's conversation with Cretul on January 29. This was evidence that Pendergraft did not observe what he said he observed. From this circumstantial evidence, the jury could infer that Pendergraft and Spielvogel agreed to fabricate the threats and Pendergraft's observation of the threats.

And there was further evidence from which a jury could infer an agreement. Spielvogel testified that he staged the phone call with Cretul and pretended to be afraid so that Pendergraft would believe that Cretul made the threats. Pendergraft testified that he witnessed Spielvogel's fear and did not know that the phone call was staged. During cross-examination, the Government raised some doubt regarding

29

whether Pendergraft could have observed Spielvogel's staged phone call when he said he did. Furthermore, both Pendergraft and Spielvogel testified that there was no agreement. When a defendant testifies, the jury is allowed to disbelieve him and to infer that the opposite of his testimony is true. *See United States v. Allison*, 908 F.2d 1531, 1535 (11th Cir. 1990). There was sufficient evidence to support a conviction on the conspiracy to commit perjury charge.

Since there was sufficient evidence to support a conviction for conspiracy to commit perjury, this part of Count One is remanded for a new trial.[8]

## B. SHUCK & JIVE

Pendergraft and Spielvogel also argue that the prosecutor injected racial prejudice into his closing argument by twice stating that Pendergraft, who is black,

---

[8]Pendergraft and Spielvogel assert that the district court abused its discretion by admitting a videotape of the settlement negotiation in which they participated. Though this issue is moot with regard to the extortion and mail-fraud convictions, it is likely to arise again on the conspiracy-to-commit-perjury charge. Rule 408 makes evidence of settlement negotiations inadmissible only when it is offered to prove liability for, invalidity of, or amount of a claim. *See* Fed. R. Evid. 408; *CNA Fin. Corp. v. Brown*, 162 F.3d 1334, 1338 (11th Cir. 1998). Since the videotape was offered as evidence of Pendergraft and Spielvogel's cooperation, and not for a purpose forbidden by Rule 408, the district court did not abuse its discretion by admitting it.

Furthermore, Pendergraft and Spielvogel request, on appeal, a prospective transfer of their proceedings from Ocala. This is an issue properly addressed to the district court on remand. *See* Fed. R. Civ. P. 21.

"shucked and jived" on the witness stand.[9] (R.25 at 472 & 486.) Since Pendergraft was convicted on legally insufficient charges, this issue is moot regarding his convictions. However, since Spielvogel was also convicted on Counts Four and Five, and these charges were not legally insufficient, we must determine whether this comment entitles him to a new trial on these counts.

Since neither party made a contemporaneous objection to the "shuck and jive" statements, we review this issue for plain error. To constitute plain error, the comment must be an error that is plain and affects substantial rights. *See United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993). We have discretion to correct such errors only when the error seriously affects the fairness, integrity, or public reputation of the judicial proceeding. *See id.*

We believe there may have been error. "Shuck and jive" is a phrase with racial origins. *See Smith v. Farley*, 59 F.3d 659, 664 (7th Cir. 1995). It began as slang adopted by American blacks to describe a situation where blacks lie to whites to stay out of trouble. *See* 15 *Oxford English Dictionary* 388 (2d ed. 1989). There is some debate regarding whether this slang has crossed over into mainstream usage. *See Smith*, 59 F.3d at 664. However, even if the phrase is not entirely of a racist character,

---

[9]Pendergraft and Spielvogel further claim that the prosecutor vouched for the credibility of Government witnesses. We do not think these comments, read in context, rise to the level of plain error.

31

it is not the sort of characterization that should be employed by an assistant United States Attorney, whose interest is not that he "shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935); *see also Handford v. United States*, 249 F.2d 295, 296 (5th Cir. 1958).

Nevertheless, despite the unsettling nature of the comment, we conclude that it did not affect Spielvogel's substantial rights. First, it was used in reference only to Pendergraft, not to Spielvogel, who is white. Pendergraft was not charged in Counts Four and Five, and any prejudice towards him would not have affected the jury's verdict on these counts. Second, Spielvogel admitted, on the stand, that he lied to the FBI and in his affidavit, and these lies provided the factual basis for the charges in Counts Four and Five. We find no plain error and no abuse of discretion in the denial of Spielvogel's motion for a new trial on Counts Four and Five.[10]

## C. SENTENCING ERRORS

---

[10]Spielvogel also contends that he should have been allowed to introduce evidence of his diminished capacity to negate his *mens rea*. Spielvogel offered the testimony of Dr. Glenn Ross Caddy, a forensic psychologist, to show that Spielvogel suffered from a personality disorder that made him easily intimidated. However, even if Spielvogel was truly afraid after his conversations with Cretul, this fear in no way shows that Spielvogel did not intend to lie when he made up details about Cretul's threats and reported them to the FBI and in his affidavit. The district court, then, did not abuse its discretion by barring Caddy's testimony. *See United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990).

Pendergraft and Spielvogel also contend that the district court erred in sentencing on extortion by finding a demand amount from an event that occurred prior to the charged conspiracy. *See* United States Sentencing Commission, *Guidelines Manual*, §2B3.3 (Nov. 2000). Because we set aside the sentences, we do not need to reach this issue.

However, we do note a technical error in the sentencing of Pendergraft and Spielvogel. Instead of imposing sentence on each count of conviction, the district court gave Pendergraft a single sentence of 46 months (R.21 at 91; R.5-151 at 2); similarly, the district court gave Spielvogel a single sentence of 41 months (R.21 at 91; R.5-152 at 2). When sentencing on multiple counts, the Sentencing Guidelines require the district court to divide the sentence among the counts and to specify whether the sentences on each count are to run consecutively or concurrently. *See* USSG §5G1.2. This technical error is now moot with regards to Pendergraft, but the district court should re-sentence Spielvogel on Counts Four and Five once the conspiracy to commit perjury charge is finally resolved.

## V. CONCLUSION

Pendergraft and Spielvogel were found guilty of conspiring to commit extortion, mail fraud, and perjury. Since both the extortion and mail-fraud charges were legally insufficient, we reverse the district court's denial of their motion for

33

judgment of acquittal and vacate the Count One conspiracy convictions. We acquit Pendergraft and Spielvogel on the charges of conspiracy to commit extortion and mail fraud but remand the charge of conspiracy to commit perjury for a new trial.

Counts Two and Three charged Pendergraft and Spielvogel with attempted extortion and mail fraud respectively, and they were found guilty. Again, because these charges are legally insufficient, we reverse the district court's denial of their motions for judgment of acquittal, reverse the convictions, and enter a judgment of acquittal.

In Counts Four and Five, only Spielvogel was charged with perjury and making a false report to the FBI. We affirm Spielvogel's convictions on these counts. However, because Spielvogel was not properly sentenced on these counts, we remand them for re-sentencing.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; VACATED AND REMANDED IN PART.