[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-15072
Non-Argument Calendar

_____

D.C. Docket No. 5:17-cr-00026-MTT-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISAAC J. CULVER, III,

Defendant-Appellant.

_____

No. 18-15073
Non-Argument Calendar

_____

D.C. Docket No.  5:17-cr-00026-MTT-CHW-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PROGRESSIVE CONSULTING TECHNOLOGIES, INC.,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(July 30, 2020)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Isaac Culver appeals his convictions and 87-month sentence for conspiracy

to commit mail and wire fraud, mail and wire fraud, and money laundering.  His

appeal was consolidated with that of his company, Progressive Consulting

Technologies, Inc. ("Progressive").  Progressive was convicted of the same

offenses and sentenced to 5-years probation and a $500,000 fine.  In their

consolidated appeal, Culver and Progressive ("Appellants") first argue that

insufficient evidence supported their conspiracy and substantive convictions for

mail and wire fraud, because the government failed to show any intentional scheme

to defraud.  Second, they argue that insufficient evidence supported their

convictions for conspiracy to commit money laundering because the government

failed to prove concealment.  Finally, Culver argues that the district court

improperly applied a two-level sophisticated means enhancement in calculating his

2

guideline sentence. After careful review, we affirm Appellants' convictions and Culver's sentence.

## I.

In 2012, the Bibb County School District decided to upgrade the school system's technology infrastructure. In June of that year, the School District published a Request for Qualifications (an "RFQ") for an entity to fill the upgrade project's Technical Project Manager role. The School District looked for a firm capable of providing "technical project management and network management support." The School District wanted a firm to oversee the purchase and installation of the technology upgrades, rather than a firm to complete the installation itself. The RFQ was the first step in the process for an applicant to become the project manager. Relevant here, another step required applicants to submit letters of recommendation from companies with whom they had recently worked.

In July 2012, Culver, on behalf of Progressive, completed an RFQ outlining Progressive's qualifications. As part of its submission package, Progressive included a letter from Allen Stephen, CEO of CompTech, Inc., a federal contracting firm located in Dayton, Ohio. However, Culver actually wrote the recommendation letter and at Culver's direction, Stephen put Culver's letter on CompTech stationary. At trial, evidence was introduced that Culver knew the

3

assertions contained in the letter were "totally made up." Stephen also acknowledged that some assertions made in the letter were entirely false.[1]

Progressive was ultimately selected to serve as the project manager for the upgrade. The "Services Agreement" reflects the terms of the parties' agreement. It states that as project manager, Progressive would "[i]nstall, relocate, configure, modify and test routers, switches, and servers"; assist with "infrastructure deployments and technical hardware refresh, renovation, and transition initiatives"; and "[e]valuate and recommend new and evolving networking technologies."

Appellants recommended the School District use the NComputing L300 device as part of its technology upgrade and the School Board approved the purchase. Culver was involved with the purchase of these devices. However, the School District believed the devices were purchased from CompTech, because Culver was directing CompTech to invoice the School District. The School District paid CompTech $3,768,000, but CompTech wired $2,151,750 of that amount back to Progressive so that Progressive could pay for the NComputing devices. In a separate transaction, CompTech wired $1,537,990 in profit to Progressive and kept the remaining $78,260 for itself. Out of the over $1.5 million wired to Progressive, Progressive wrote several checks payable to Culver. The

---

[1] For example, Progressive and CompTech never worked together on the project Culver described in the letter. And, despite the letter's claim that CompTech had an office in Atlanta, CompTech did not.

School District did not know that CompTech was sending money back to Progressive as part of the purchase.

In March 2013, the School District contacted CompTech to ask when the NComputing devices would be installed. Stephen, however, never intended CompTech to perform the installation because he believed Progressive was doing it. When Stephen contacted Culver about this issue, Culver sent Stephen information about the equipment and deployment and directed Stephen to respond to the School District's inquiries.

At some point during the spring of 2013, the School District began to question how the technical upgrade was being managed. On April 17, 2013, Culver sent Stephen a letter advising him that the School was putting together a timeline and record of payments to vendors for 2012. Culver again directed Stephen how to respond on behalf of CompTech. Culver told Stephen to say that in order to get the School District a discount on the NComputing devices, Progressive asked CompTech to purchase the devices and take a small profit "as a pass through for using CompTech's GSA schedule." Then on April 22, 2013, Culver sent Stephen a "heads up" email, letting Stephen know that he should tell the School District that CompTech was doing the install of the NComputing devices, and that CompTech had two "employees." None of this information was true.

Eventually, the School District shut down the technology upgrade project. Only 300 of the 15,000 NComputing devices purchased were installed. The School District deemed the rest of the devices "unusable" because key components, like monitors and keyboards, were not purchased. In June 2017, the government indicted Progressive and Culver based on their roles in this scheme. A jury found them guilty of conspiracy to commit mail and wire fraud, mail and wire fraud, and money laundering. Culver was sentenced to a term of 87-months imprisonment and Progressive was sentenced to 5-years probation and a $500,000 fine. This appeal followed.

## II.

We review de novo whether sufficient evidence supported a jury's guilty verdict. United States v. Foster, 878 F.3d 1297, 1303–04 (11th Cir. 2018). In doing so, we view the evidence in the light most favorable to the prosecution and resolve all reasonable inferences and credibility evaluations in favor of the verdict. Id. at 1304. In considering the sufficiency of the evidence, our only task is to determine whether any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. United States v. Feldman, 931 F.3d 1245, 1258 (11th Cir. 2019). The jury's guilty verdict must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt. Foster, 878

6

F.3d at 1304.  A jury is free to choose among reasonable constructions of the evidence, so it is unnecessary that the evidence exclude every reasonable theory of innocence or be wholly inconsistent with every conclusion except that of guilt.  Id. It is not enough for a defendant to put forth a reasonable hypothesis of innocence, as the issue is not whether a jury reasonably could have acquitted, but whether it reasonably could have found guilt beyond a reasonable doubt.  United States v. Beckles, 565 F.3d 832, 840–41 (11th Cir. 2009).

Credibility determinations are also left to the jury.  United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) (per curiam).  A jury is entitled to believe as much or as little of a witness's testimony as it finds credible.  United States v. Matthews, 431 F.3d 1296, 1312 (11th Cir. 2005) (per curiam).  If the jury does not believe a defendant's testimony, the jury may take it as evidence that "the opposite of his testimony is true."  United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004) (quotation marks omitted).

That said, we turn to Culver and Progressive's two sufficiency-of-the-evidence arguments.

A. MAIL AND WIRE FRAUD

A conviction for wire fraud requires that the government prove beyond a reasonable doubt that the defendants (1) participated in a scheme or artifice to defraud, (2) with intent to defraud, and (3) used, or caused the use of, interstate

wire transmissions for the purpose of executing the scheme or artifice to defraud. United States v. Machado, 886 F.3d 1070, 1082–83 (11th Cir. 2018). Mail and wire fraud "are analytically identical save for the method of execution." United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011); see also 18 U.S.C. §§ 1341, 1343.

Courts have construed the phrase "scheme to defraud" broadly. United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir. 2002). The word "defraud" means "the deprivation of something of value by trick, deceit, chicane, or overreaching." Id. (quotation marks omitted). To establish a scheme to defraud, the government must offer "proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." Bradley, 644 F.3d at 1238 (quotation marks omitted).

In addition, the government must prove the defendant's intent to defraud. Id. at 1239. "To gauge a defendant's intent to commit a fraudulent scheme . . . we must determine whether the defendant attempted to obtain, by deceptive means, something to which he was not entitled." Id. at 1240. An intent to defraud for purposes of mail and wire fraud may be inferred from the defendant's conduct. United States v. Maxwell, 579 F.3d 1282, 1301 (11th Cir. 2009). "Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of

an intent to participate in that fraud." United States v. Naranjo, 634 F.3d 1198, 1207 (11th Cir. 2011).

Appellants' sufficiency argument rests on United States v. Takhalov, 827 F.3d 1307 (11th Cir. 2016), which held that mere deception is insufficient to constitute a "scheme to defraud." Id. at 1313–14. In Takhalov, this Court reversed a wire fraud conviction because the district court refused to give an instruction to the jury that the defendants intended to defraud their victims. Id. at 1315–16, 1325. In that case, the government presented evidence to establish that the defendants tricked men into coming into the defendants' nightclubs by paying women (B-girls) to lure them into their clubs. Id. at 1310. Once inside, club employees "would pour vodka in the men's beer to get them drunker, misrepresent the prices of drinks, hide menus, cover up prices, and even forge the men's signatures on credit-card receipts." Id. The defendants asked the district court to instruct the jury that "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]" Id. at 1314 (alterations in original) (quotation marks omitted). On appeal, this Court held that the district court should have charged the jury that in order to find a scheme to defraud, it had to find both deception about the nature of the transaction and an intent to harm. Id. at 1312–16.

9

Here, Appellants argue that although there was sufficient evidence that they deceived the school district, the evidence was not sufficient to prove their intent to defraud.  Appellants claim there was no evidence of intent to misrepresent the price or fees charged and no evidence that they misrepresented the characteristics or quality of the devices.  However, Appellants' Takhalov-based arguments are not persuasive.

There was sufficient evidence here to support Culver's and Progressive's conspiracy and substantive wire and mail fraud convictions.  Progressive, through its agents, "constructed an elaborate scheme that allowed them to reap inflated profits" and left the School District "with almost nothing for its $3,768,000.00 investment."  R. Doc. 202 at 3.  Witnesses testified that Appellants deceived the School District into hiring Progressive as the project manager because Progressive fabricated a recommendation letter from CompTech.  There was also testimony that Appellants used CompTech as a pass-through for the purchase of the devices to hide the fact that Progressive was acting as a vendor.  This is relevant because under the agreement with the School District, Progressive was to provide product management services, and when Progressive acted as a vendor, it created a conflict of interest.  Based on this evidence, the jury could reasonably infer that Appellants made misrepresentations to the School District in an "attempt[] to obtain, by

10

deceptive means, something to which [they were] not entitled." Bradley, 644 F.3d at 1240.

Appellants also argue that any misrepresentations they made did not affect the essential nature of the parties' bargain and therefore were not material. Because fraud requires a false statement of "material" fact, Appellants argue this evidence was not sufficient to prove mail and wire fraud. See Maxwell, 579 F.3d at 1299 ("A scheme to defraud requires proof of a material misrepresentation . . . calculated to deceive another out of money or property.").

This Court addressed a similar situation in Maxwell. There, the defendant acquired state and federal contracts to perform work as minority contractors, even though they were not minorities. Id. at 1291. The defendant argued that, although various contracts he signed had explicit provisions requiring the work to be performed by a minority contractor, he did not deprive the victims of money or property because they received the work they sought. Id. at 1302. A panel of this Court rejected the defendant's argument, noting that the mail and wire fraud statutes "also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." Id.

Appellants argue that Maxwell is distinguishable because the contract in that case "contained explicit provisions that only minority businesses could apply," whereas Progressive's agreement with the School District "did not include any

11

provision preventing them from acting as the vendor for the NComputing

transaction and/or to provide conflict-free advice." Br. of Appellants at 31. But

this fact does not distinguish Appellants' case. A misrepresentation need not be a

term included in the parties' agreement for it to be material. Rather, a

misrepresentation is material if it has "a natural tendency to influence, or is capable

of influencing, the decision maker to whom it is addressed." Maxwell, 579 F.3d at

1299 (alteration adopted) (quotation marks omitted). A jury could reasonably find

that Appellants' fabricated recommendation letter and misrepresentations about

CompTech's role influenced the School District in purchasing the NComputing

devices. We therefore affirm the jury's verdict as to the mail and wire fraud

convictions.

B. MONEY LAUNDERING

We next examine the sufficiency of the evidence supporting Appellants'

convictions on the money laundering counts under 18 U.S.C. § 1956(a)(1)(B)(i).

Section 1956(a)(1)(B)(i) is sometimes referred to as the "concealment" provision

of the money laundering statute. United States v. Majors, 196 F.3d 1206, 1211

(11th Cir. 1999). This section "was designed to punish defendants who thereafter

take the additional step of attempting to legitimize their proceeds so that observers

think their money is derived from legal enterprises." Id. at 1212.

In this case, the government had to prove to the jury that: (1) Appellants conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) Appellants knew the proceeds were from some form of illegal activity; and (4) they knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the illegal proceeds. United States v. Miles, 290 F.3d 1341, 1355 (11th Cir. 2002) (citing § 1956(a)(1)(B)(i)). Appellants challenge the sufficiency of the evidence only as to the fourth element.

Specifically, Appellants argue the government's evidence was insufficient to prove the existence of "any transaction that was designed to conceal the nature, location, source, ownership, or control of any illegal proceeds" as required under the concealment provision in § 1956(a)(1)(B)(i). Appellants say they did not disguise any transaction with aliases, fake addresses, complicated or unnecessary transactions, or engage in any other concealment efforts, so the government's evidence did not show the "animating purpose" of the transaction made it more difficult for law enforcement to trace the funds at issue. Br. of Appellants at 33.

In determining whether there was a purpose of concealment, this Court looks to whether there is evidence of:

> [S]tatements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using

13

third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

United States v. Blankenship, 382 F.3d 1110, 1130 (11th Cir. 2004) (alteration adopted) (quoting Majors, 196 F.3d at 1213 n.18).  In Blankenship, the defendant deposited illegitimate funds into his business account, and then transferred those funds into bank accounts in his own name.  Id. at 1128–29.  We held the evidence was insufficient to show concealment because (1) the money was in accounts in the defendant's name, and (2) the accounts were private so the defendant "could not reasonably have anticipated" receiving a "marginal increase in secrecy" by moving the money between those accounts.  Id.  By comparison, in Majors, defendants deposited illegitimate funds in business accounts of two corporations, transferred those funds to other, legitimate third-party corporations, and then transferred those funds from the legitimate corporations directly into their own pockets.  Majors, 196 F.3d at 1214.  This Court held that evidence was sufficient to prove money laundering because, in the light most favorable to the government, it supported the jury's finding that the defendants "had a specific intent to structure their financial transactions so as to conceal or disguise the true nature and source of the transfer of funds between corporations and, ultimately, to them."  Id.

Appellants say this case is different because they funneled funds through CompTech only for the purpose of defrauding the School District, not to conceal

14

the funds themselves.  Although the evidence introduced at trial shows that Appellants funneled the purchase of NComputing devices through CompTech to deceive the School District, there was other evidence in the record that showed concealment of the funds.  For instance, investigators had to examine CompTech's account statements in order to discover the fact that, after Progressive paid NComputing, it retained a profit from the funds paid by the school district for the NComputing devices.  In addition, Progressive instructed CompTech to wire the funds from the NComputing devices in two separate transactions in two separate amounts.  Based on this evidence, a rational juror could—and did—conclude that Appellants' use of CompTech as a third party, and directions to wire funds of $2,151,750 and $1,537,990 in two separate transactions, was intended to conceal the illegitimate proceeds of their fraud.  See Blankenship, 382 F.3d at 1130 (looking to "secrecy surrounding the transaction," "depositing illegal profits in the bank account of a legitimate business," and "using third parties to conceal the real owner").

In sum, and taking the evidence in a light most favorable to the government, Culver and Progressive's transfer of money in two amounts through a third-party company constituted sufficient evidence to show that a purpose of the transaction was to conceal or disguise the source, ownership, or control of the illegal proceeds.

15

We therefore affirm Appellants' convictions for conspiracy to commit money laundering.

## III.

Culver also argues that the district court miscalculated the Sentencing Guidelines range by erroneously finding his conduct fell within the "sophisticated means" enhancement. See U.S. Sentencing Guidelines § 2B1.1(b)(10)(C). He says Appellants' scheme "was neither complex nor intricate," as is required to increase a sentence based on a sophisticated-means offense. Br. of Appellants at 37.

We review for clear error the district court's findings of fact related to the imposition of sentencing enhancements, including a finding that the defendant used sophisticated means. United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010). When reviewing for clear error, we will not disturb a district court's findings "unless we are left with a definite and firm conviction that a mistake has been committed." Id. (quotation marks omitted). After careful review, we hold that the district court did not clearly err in applying the sophisticated-means enhancement.

The Sentencing Guidelines provide for a two-point enhancement of a defendant's offense level if the "offense . . . involved sophisticated means." USSG § 2B1.1(b)(10)(C). The sophisticated means enhancement should only be applied

16

to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of" the scheme.  Id. § 2B1.1(b)(10) cmt. n.9(B).  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  Id.  There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.  Ghertler, 605 F.3d at 1267.  Rather, it is enough if the totality of the scheme was sophisticated.  Id.

We cannot say the district court clearly erred in finding that Culver used sophisticated means to perpetrate or conceal his fraudulent scheme because his offense conduct could be viewed as "especially complex or . . . intricate."  See USSG § 2B1.1(b)(10) cmt. n.9(B).  Here, the district court found that increasing Culver's sentence was warranted because of the "significan[ce]" of Culver's attempts to cover up his conduct by directing CompTech to communicate with the School District.  The district court also found (albeit when discussing a separate ground for increasing Culver's sentence) that the scheme continued for an extended period of time; Appellants "us[ed] deception to get the contract to become the project manager"; and Appellants engaged in a well-documented cover-up "as the School District began to ask questions."

17

Like in Ghertler, it may be true that "aspects of [Culver's] scheme were not sophisticated," but under our deferential standard of review, the totality of his activities spanning July 2012 through April 2013 is sufficient to support the district court's finding that Culver used sophisticated means.  605 F.3d at 1268; see United States v. Feaster, 798 F.3d 1374, 1381 (11th Cir. 2015) ("Regardless of whether the defendant undertook affirmative acts of concealment, the scheme itself may be designed in a sophisticated way that makes it unlikely to be detected, allowing it to continue for an extended period and to impose larger losses.").  These activities included: providing a fabricated reference letter to obtain a government contract; using false invoices to hide Progressive's role as a profiting vendor; sending a deceptive email, copying the School District, that gave the appearance of a fake arm's length negotiation; and feeding CompTech responses to the School District's inquiries.  In short, Culver's offenses "involved repetitive, coordinated conduct designed to allow him to execute his fraud and evade detection."  United States v. Bane, 720 F.3d 818, 826–27 (11th Cir. 2013) (affirming imposition of a longer sentence when offense involved multiple corporations, required employees to create a paper trail to mask the fraud, and involved steps to conceal the offense).

Thus, although Culver did not attempt to conceal his role in the fraud through false identities or fictitious entities, the totality of his activities carried out over the course of his relationship with the School District were sufficiently

18

complex to support finding that he used sophisticated means.  See Ghertler, 605 F.3d at 1267–68.  We therefore affirm the district court's application of the sophisticated-means enhancement and Culver's 87-month sentence.

    **AFFIRMED.**