[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14084

_____

D.C. Docket No. 1:13-cr-20063-DLG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LAWRENCE FOSTER,
a.k.a. Lorenzo Foster,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 4, 2018)

Before JORDAN, HULL, and GILMAN,[*] Circuit Judges.

GILMAN, Circuit Judge:

_____
[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## I. OVERVIEW

This is a real estate fraud case.  A jury convicted Lawrence Foster of defrauding investors with regard to real estate located on the island of Rum Cay in the Bahamas.  Foster appeals the district court's (1) denial of his three motions for a judgment of acquittal; (2) determination of the loss amount, restitution award, and his sentence; and (3) denial of his motion to vacate the verdict due to alleged juror misconduct.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## II. BACKGROUND

### A.    Factual background

Foster served as president of Paradise Is Mine, Inc. (PIM), a Florida corporation that offered investments in Rum Cay land.  (R. 452, USCA 2752; R. 528, USCA 4931)  The company's website proclaimed that PIM "own[ed] in excess of 16,000 acres of prime, investment grade real estate."  (R. 455, USCA 3317)  PIM solicited investors online and by telephone, offering them two investment opportunities:  they could either (1) purchase Rum Cay land or (2) lend money to PIM in return for a security interest in the land.  PIM targeted people who had recently lost money in the stock or precious-metals markets, giving them an above-market-value credit for any stock or precious-metals investments

2

transferred to PIM as consideration.  (R. 452, USCA 2689–90, 2698–2700, 2969, 2974–75)

Foster used several marketing strategies, including celebrity endorsements, to promote PIM.  One endorsement involved Joe Montana, a professional-football icon, who agreed to endorse PIM in return for a parcel of Rum Cay land.  (R. 456, USCA 3417–58)  Foster then represented to prospective investors that Montana had purchased Rum Cay land from PIM.  (R. 452, USCA 2696–98, 2705–06, 2733; R. 453, USCA 2816–17, 2860–61, 2897, 2910–12; R. 454, 2994–95, 3038–40, 3060; R. 455, USCA 3317–19, 3325–29)  Several investors testified at trial that they had invested with PIM partly because they believed that celebrities like Montana had done so.  *Id.*

Foster also represented to prospective investors that hundreds of news organizations, including *USA Today* and *The Wall Street Journal*, had "featured" articles about PIM within the past two years.  (R. 454, 3007–14; R. 455, USCA 3318–22).  Images of articles appeared on PIM's website, and Foster himself emailed articles to prospective investors who expressed hesitation about investing.  *Id.*  Several investors later testified that they had invested with PIM partly because they had believed that the articles gave PIM credibility. (R. 453, USCA 2898, 2911–16; R. 454, USCA 2994–96, 3007–14)

PIM, in fact, was a scam.  The land that it purported to own was actually held in the name of Sunward Holdings, a Bahamian company owned by a convicted felon and embroiled in litigation over title to the land.  (R. 457, USCA 3662–71; R. 458, USCA 3897–3906, 3917, 3947–54; 3662; R. 459, USCA 3994–4001, 4072)  PIM did not inform investors that Sunward held the disputed title to the land until after they had transferred cash, stock, retirement accounts, or other value to PIM.  (R. 453, USCA 2756, 2809–10, 2826–30, 2852–56, 2861, 2870–72, 2899–2909; R. 454, USCA 2958–59, 3038–48)  Moreover, no reporter for either *USA Today* or *The Wall Street Journal* had ever written anything about PIM or the land.  (R. 455, USCA 3251–54, 3270–74)  Foster created some of the articles himself.  (R. 455, USCA 3320–22; R. 458, USCA 3854)  Others were created by a public-relations firm that he had hired.  (R. 235, USCA 1133, 1150–53)

None of the investors ever received title to the Rum Cay land.  Those who agreed to purchase land from PIM instead received an option contract under which they could, at least in theory, purchase land from Sunward and apply for a title from the Bahamian government, which in turn would impose a stamp tax of 10% of the purchase price.  But PIM failed to provide the investors with the documentation they needed to exercise their options.  (R. 456, USCA 3430–48)

Those who made loans to PIM received security agreements, but the Rum Cay land securing the loans belonged to Sunward, putting the collateral out of

4

reach.  Several such investors testified that they did not even know the collateral's location.  (R. 453, USCA 2829–30; R. 571, USCA 5447–48, 5456–57).

On the other hand, PIM's salespeople received exorbitant commissions of up to 50% of the price of the investments they sold.  (R. 459, USCA 4037)  And Foster withdrew over a million dollars in cash from PIM's accounts and transferred another million dollars or more to jewelry and rare-coin companies with no apparent benefit to PIM's investors.   (R. 456, USCA 3486–3500; R. 519, USCA 4710–15)  He also made no significant improvements to the Rum Cay land and, from 2008 to 2012, filed no corporate or personal income-tax returns. (R. 455, USCA 3295)

## B.    Procedural background

Foster was charged in a superseding indictment with one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349, and with six counts of wire fraud, in violation of 18 U.S.C. § 1343.  (R. 72, USCA 822–33)  A jury convicted him on all counts.   (R. 196, USCA 834)  Because of an error in the exhibits given to the jury, however, the district court ordered a new trial.  (R. 272, USCA 1823) At the second trial, Foster twice moved for a judgment of acquittal, first at the close of the government's proof and again at the close of his own.  (R. 457, USCA 3651; R. 461, USCA 4123)  The court denied both motions.  (R. 457, USCA 3655;

5

R. 461, USCA 4126)  A jury again convicted Foster on all counts.    (R. 375, USCA 2186–87)

Several days after the trial's conclusion, the district court received a letter from a juror alleging that some of the other jurors had bullied her into reaching a guilty verdict, which she now regretted.  (R. 383, USCA 2201–04)  This prompted Foster to file a motion to vacate the verdict.  The court declined to do so.  (R. 390, USCA 2239–47; R. 421, USCA 2419)  Foster then moved a third time for a judgment of acquittal, arguing that insufficient evidence supported his convictions. (R. 403, USCA 2302–20)  The court denied that motion as well.  (R. 471, USCA 4355)

After a sentencing hearing that spanned three days, the district court determined the loss amount to be the full value of the victims' investments. (R. 560, USCA 5244, 5263–65)  It ordered Foster to pay restitution in the amount of $8,190,110 (the full amount of the loss, less about $280,000 previously returned to a few of the investors in the form of loan repayments) and sentenced him to 152 months in prison.  (R. 560, USCA 5254–55, 5265)  This timely appeal followed. (R. 543, USCA 5063)

## III. ANALYSIS

### A.    Standard of review

We review de novo the district court's conclusions of law, *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005), and the sufficiency of the evidence supporting a defendant's conviction, *United States v. Majors*, 196 F.3d 1206, 1210 (11th Cir. 1999). The district court's determination of the loss amount, on the other hand, is reviewed under the clear-error standard. *United States v. Maxwell*, 579 F.3d 1282, 1305 (11th Cir. 2009). Under this standard of review, we "will not find clear error unless our review of the record leaves us 'with the definite and firm conviction that a mistake has been committed.'" *Coggin v. Comm'r of Internal Revenue*, 71 F.3d 855, 860 (11th Cir. 1996) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). As to Foster's sentence, we "must review the sentence under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007).

### B.    The district court properly denied Foster's motions for a judgment of acquittal.

Foster initially argues that the district court erred in denying his three motions for a judgment of acquittal. "In reviewing the sufficiency of the evidence to support the jury verdict, we view the evidence in the light most favorable to the government[,] [such that] all reasonable inferences and credibility choices are made in the government's favor." *Majors*, 196 F.3d at 1210. We "will affirm the

7

conviction[] if a reasonable fact-finder could have reached a conclusion of guilt beyond a reasonable doubt." *Id.* "It is not necessary for the government to disprove every reasonable hypothesis of innocence, as a jury is 'free to choose among reasonable constructions of the evidence.'" *Id.* (quoting *United States v. Jones*, 913 F.2d 1552, 1557 (11th Cir. 1990)).

Foster's arguments regarding the sufficiency of the evidence relate exclusively to the elements of fraud. Wire fraud occurs when a person intentionally participates in a "scheme to defraud" and uses the interstate wires to further that scheme. *Maxwell*, 579 F.3d at 1299. "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id.* (citing *United States v. Svete*, 556 F.3d 1157, 1161, 1169 (11th Cir. 2009) (en banc)). "Material" misrepresentations or omissions are ones "having a natural tendency to influence, or capable of influencing, the decision maker to whom it is addressed." *United States v. Hasson*, 333 F.3d 1264, 1271 (11th Cir. 2003). The misrepresentation or omission must "be one on which a person of ordinary prudence would rely." *Id.*

Foster makes several arguments as to why the evidence presented at trial was purportedly insufficient to prove that he made any of the alleged misrepresentations or omissions or that he acted with criminal intent. First, he contends that the government failed to present evidence from which a reasonable

8

jury could conclude that he had misrepresented the land's ownership. But the government presented evidence that PIM represented itself as the owner of the Rum Cay land, and that it failed to inform investors that Sunward held the disputed title to the land until after they had transferred cash, stock, retirement accounts, or other value to PIM. (R. 453, USCA 2756, 2809–10, 2821–30, 2852–56, 2861, 2870–72, 2899–2909; R. 454, USCA 2958–59, 3038–48). The government also presented evidence that Sunward was a Bahamian company owned by a convicted felon and embroiled in litigation over its title. (R. 457, USCA 3662–71; R. 458, USCA 3897–3906, 3917, 3947–54; 3662; R. 459, USCA 3994–4001, 4072).

Second, Foster argues that the government failed to present evidence sufficient for a reasonable jury to conclude that he made material misrepresentations or omissions regarding the purported news articles about PIM. But the government presented evidence that Foster stated on PIM's website and in emails to investors that *USA Today* and *The Wall Street Journal*, as well as hundreds of other news organizations, had "featured" numerous articles about PIM within the past two years. (R. 454, USCA 3007–14; R. 455, USCA 3318–22) The government also presented evidence that Foster had created some of those articles himself and that no reporter for either *USA Today* or *The Wall Street Journal* had written anything about PIM. (R. 455, USCA 3251–54, 3270–74, 3320–22; R. 458, USCA 3854) Three investors testified that the press releases, which they had

believed were articles written by reporters who had researched PIM, influenced their decision to invest. (R. 453, USCA 2898, 2911–16; R. 454, USCA 2994–96, 3007–14)

Third, Foster argues that the government failed to present evidence sufficient for a reasonable jury to conclude that he made material misrepresentations or omissions regarding the celebrity investors.    But the government presented evidence that Foster represented to investors that Montana and other celebrities had purchased land from PIM.   (R. 452, USCA 2696–98, 2705–06, 2733; R. 453, USCA 2910–11; R. 455, USCA 3317–19, 3325–29)  To the contrary, the evidence showed that PIM had given Montana and other celebrities options to purchase Rum Cay land at no cost to themselves.  Yet when Montana tried to exercise his option, he could not obtain title because PIM had not given him the necessary documents. (R. 456, USCA 3430–48).   Four investors testified that Foster's representation that celebrities had purchased land from PIM had influenced their decision to invest. (R. 453, USCA 2816, 2860–61, 2897; R. 454, 2994–95, 3038–40, 3060)

Finally, Foster argues that, even if he made material misrepresentations or omissions, the government failed to prove that he acted with criminal intent.  But a jury "may infer an intent to defraud from the defendant's conduct."  *Maxwell*, 579 F.3d at 1301.  Here, the jury could have inferred Foster's criminal intent from his pattern of misrepresentations and omissions.  *See, e.g.*, *United States v. Kieffer*,

621 F.3d 825, 832 (8th Cir. 2010) ("Kieffer's intent to defraud may be inferred from his pattern of deceit.").

The jury also could have inferred Foster's criminal intent from evidence that none of PIM's investors ever obtained title to the Rum Cay land and that Foster withdrew over a million dollars in cash from PIM's accounts and transferred another million dollars or more to jewelry and rare-coin companies, all while making no significant improvements to Rum Cay's infrastructure and filing no corporate or personal income-tax returns.  (R. 453, USCA 2761–63, 2827–30, 2904–2913; R. 454, 2934, 2958–59, 3051–53; R. 455, USCA 3294–95; R. 456, USCA 3486–3500; R. 456, USCA 3486–3500; R. 519, USCA 4710–15)  From all of this evidence, a reasonable jury could have concluded beyond a reasonable doubt that Foster made material misrepresentations or omissions calculated to deceive investors and thus deprive them of their money—in other words, that he committed fraud.  We therefore conclude that the district court committed no error in denying Foster's motions for a judgment of acquittal.

**C.    The district court did not err in determining the loss amount, restitution award, and Foster's sentence.**

Foster next challenges the restitution award and his sentence, both of which flowed from the district court's determination of the amount of loss suffered by the investors.  We will therefore examine the loss amount before turning to the restitution award and Foster's sentence.

11

### *1. The district court did not err in determining the loss amount.*

To calculate the loss amount, courts may use a "'net loss' approach." *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quoting the U.S. Sentencing Guidelines Manual (2003)). "[L]oss should be measured from the perspective of the victim." *United States v. Machado*, 333 F.3d 1225, 1228 (11th Cir. 2003). The government bears the burden of proving the loss amount. *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) (citing 18 U.S.C. § 3664(e)). "Where, as here, a defendant's conduct was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim[s] to the fraudulent enterprise as the starting point for calculating the victim[s'] pecuniary harm." *Campbell*, 765 F.3d at 1305.

Because "value may be rendered even amid fraudulent conduct," however, "[i]f the defendant returned any money to the victim[s] or rendered any legitimate services to [them] before the fraud was detected, the loss amount must be reduced by the fair market value of the returned money or the services rendered." *Id.* at 1302 (internal quotation marks omitted) (quoting in part *United States v. Sayakhom*, 186 F.3d 928, 946 (9th Cir. 1999)). This approach recognizes that "the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not." *Id.* (internal quotation marks omitted) (quoting the U.S. Sentencing Guidelines Manual (2003)). But a

12

defendant is not entitled to receive credit for returning money if his sole purpose in doing so is "to conceal or perpetuate his scheme." *Campbell*, 765 F.3d at 1302.

Foster concedes that the starting point for determining the loss amount is the total amount that he received from investors: $8,305,433.71. (Def.'s Br. 37; R. 560, USCA 5264–66)   He challenges only the district court's decision to not subtract from that figure the "value of the lots received by the purchasers" and the "value of the lots which collateralized the lenders' loans."   (Def.'s Br. 36) Avoiding the thorny question of whether the option contracts and security agreements in fact created any proprietary interest in Rum Cay land, the court found that, even if those documents theoretically created a proprietary interest of some kind, that interest would be "worth nothing" to the investors as a practical matter.   (R. 560, USCA 5264; R. 541, USCA 5053)   Finding that Foster had provided no value to the investors, the court applied no offset.   (R. 560, USCA 5263–64)

Ample evidence supports this finding.   Foster concedes that none of the investors ever obtained title to the Rum Cay land.   Several investors who loaned money to PIM testified that they did not even know the location of the property that supposedly collateralized their loans.   (R. 453, USCA 2829–30; R. 571, USCA 5447–48, 5456–57).   Even Montana did not succeed in exercising his option.   (R. 456, USCA 3430–48)   The fact that Sunward is a foreign entity

litigating its title to the land in a foreign forum suggests that the investors might be unable to obtain title no matter what their resources.

And without a title in hand, the investors would be unable to sell whatever interest they did have, whether an option contract or a security interest, given the cloud of fraud hanging over the property.  (R. 560, USCA 5226)  Moreover, as Foster's counsel forthrightly acknowledged at oral argument, many of the investors' option contracts have expired.  All of this leads us to the conclusion that the district court did not err in finding that Foster provided no value to the investors.

The district court also articulated a second ground for denying Foster credit for any value that he purportedly provided to the investors—that a fraudster is not entitled to an offset for value provided solely to conceal or perpetuate the fraud. (R. 560, USCA 5244)  Several circuits, including this one, "have held that a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to conceal or perpetuate his scheme."  *Id.* (citing cases). At Foster's sentencing hearing, the court found "that that is precisely what happened in this case."  (R. 560, USCA 5244)  The same finding appears in a memorandum opinion that the court issued shortly thereafter:

> Defendant Foster provided option agreements for the purchase of land, and documents purporting to show collateral in Rum Cay land to ensnare victims.  Because the documents that Defendant Foster

14

provided to the victims were needed to perpetuate and continue the fraud, they should not be the basis of a reduction.

(R. 541, USCA 5051)

Foster argues, however, that the exception to the rule of crediting value against loss does not apply to his case because the exception "contemplates circumstances such as Ponzi schemes, where a defendant is robbing Peter to pay Paul, and paying one victim with money illegally derived from . . . another." (Def.'s Br. 39)  But precedent suggests otherwise.  In *Campbell*, the defendant created a nonprofit organization to steal grant money flowing from the state legislature to an affiliation of other nonprofits.  *Id.* at 1294.  Using his relationships with state legislators, as well as his position as the director of the affiliation receiving the grant money, Campbell interposed his nonprofit between the legislature and the affiliation, then diverted to himself some of the money passing through.  *Id.*  This court concluded that Campbell had "created the [nonprofit] and inserted it into the [affiliation's] funding stream for the sole purpose of" committing fraud.  *Id.* at 1304.  Because "there was no valid reason" for the nonprofit's creation, Campbell was not entitled to a credit against the loss amount, even if the nonprofit "occasionally used some of the state money to perform functions" valuable to the affiliation.  *Id.*

The same reasoning applies here.  There is no evidence that Foster created PIM for any purpose other than to commit fraud.  As the district court found, he

15

did not use any of the investors' money to develop the Rum Cay land. Much of that money instead went straight into his own pockets. It also went to PIM's salespeople, who received commissions of up to 50% of the price of the investments they sold, suggesting that the investments' prices dwarfed their actual value. (R. 457, USCA 4037) Further, PIM offered nothing that Sunward could not have offered by itself. The district court therefore did not err in concluding that Foster provided no value to the investors and that, in any case, he should receive no credit against the loss amount.

### 2. The district court did not err in determining the restitution amount.

From the loss amount flowed the restitution award. When a defendant is convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343, the court is "obligated to order restitution under the Mandatory Victim Restitution Act . . . , 18 U.S.C. § 3663A." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010). "An award of restitution must be based on the amount of loss actually caused by the defendant's conduct." *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001). When the property lost is money, "[t]he order of restitution shall require" the defendant to "pay an amount equal to . . . the greater of . . . the value of the property on the date of the . . . loss . . . or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b). "The defendant bears

16

the burden to prove the value of any . . . goods or services he provided that he claims should not be included in the restitution amount." *United States v. Bane*, 720 F.3d 818, 829 n.10 (11th Cir. 2013).

To determine the restitution amount, the district court started with the loss amount of approximately $8,305,433. It then subtracted the amount that Foster had previously returned to some of the investors in the form of loan repayments. (R. 541, USCA 5045). That amount was approximately $280,323. (R. 541, USCA 5045) Later, the government discovered more victims, whose losses added another $165,000 to the loss amount. (R. 560, USCA 5259) The court thus ordered restitution in the net amount of $8,190,110. (R. 560, USCA 5265) (To the extent that the government returns to the investors any part or all of the approximately $1,100,000 that it seized from PIM, this will reduce Foster's restitution obligation accordingly.)

Foster's argument regarding restitution is the same as his argument regarding the loss amount: "Once again, the Court failed to give credit for the collateral against the loss incurred by the victims." (Def.'s Br. 41) We reject his argument here for the same reasons discussed above and conclude that the district court did not err in finding that the option contracts and security agreements held no value for the investors.

17

### 3. *The district court did not abuse its discretion in fashioning Foster's sentence.*

We next turn to Foster's sentence, which we "must review . . . under an abuse-of-discretion standard." *See Gall v. United States*, 552 U.S. 38, 51 (2007). This review entails a two-step process. First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, . . . failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* If the "sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed." *Id.* The "fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

### a. *Foster's sentence is procedurally reasonable.*

Foster's challenges to the procedural reasonableness of his sentence are threefold. First, he disputes the facts on which his sentence is based. But those facts are the same ones that underlie his conviction. As discussed above, the district court's factual findings are not clearly erroneous. Second, Foster argues that the court used the wrong loss amount in calculating the Sentencing Guidelines range. But this is simply a rehashing of his argument about the court's calculation of the loss amount itself—that he should have received an offset for the value he

18

purportedly provided to the investors.  Again, the court's finding on the loss amount is not clearly erroneous.  Foster's third and final argument is that the district court "failed to adequately consider . . . mitigating factors outlined in his objection to the [presentence report]." (Def.'s Br. 43)  Foster does not specifically point to any such failure, however, and we have found none.  His argument, at bottom, concerns the substantive rather than the procedural reasonableness of his sentence.  We therefore find no procedural error.

### b.  Foster's sentence is substantively reasonable.

"[S]ubstantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions." *United States v. Irey*, 612 F.3d 1160, 1194 (11th Cir. 2010).  "Although we do not automatically presume [that] a sentence within the [G]uidelines range is reasonable, we 'ordinarily . . . expect a sentence within the Guidelines range to be reasonable.'" *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (quoting *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005)).

The district court calculated Foster's Sentencing Guidelines range as 135 to 168 months of imprisonment.  It then imposed a sentence of 152 months' imprisonment, precisely the middle of the range.  (R. 560, USCA 5253–54, 5246)  At the sentencing hearing, the court stated:  "I have considered a great deal of testimony and legal argument in this case, likely more argument than I think I've

heard in any case in many, many years.  So I feel comfortable that the parties have stated their positions clearly and completely."  (R. 560, USCA 5244)

Rejecting Foster's request for a downward variance, the court explained that "$8 million" is "no small amount" and is "the amount that the victims do not have access to" because of Foster's fraud.  (R. 560, USCA 5245–46)  That amount, the court concluded, "reflects . . . a serious offense."  (R. 560, USCA 5245)  The court then heard argument from both parties on the § 3553(a) factors.  (R. 560, USCA 5246–53)

Before pronouncing Foster's sentence, the district court "considered the statements of all parties; the presentence report, which contains the advisory guidelines; and the statutory factors as set forth in Title 18, United States Code, Section 3553(a)."  (R. 560, USCA 5253)  Because Foster points to no irregularities in the court's consideration of the § 3553(a) factors, and the court imposed a sentence in the middle of the Sentencing Guidelines range, we conclude that the court did not abuse its discretion in determining Foster's sentence.

**D.    The district court did not err in denying Foster's motion to vacate the verdict for alleged juror misconduct.**

This brings us to the final issue—the alleged juror misconduct during deliberations.  "District courts are subject to very stringent limitations on their authority to question jurors about their deliberations, and to use one or more juror's

20

testimony to impeach the verdict of all." *United States v. Siegelman*, 640 F.3d 1159, 1185 (11th Cir. 2011).

> Rule 606(b)(1) of the Federal Rules of Evidence provides as follows:
>
> [A] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

This rule "imposes a nearly categorical bar on juror testimony." *United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015). Only three exceptions exist: "A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

Foster invokes the first exception, arguing that the juror's letter shows that extraneous prejudicial information was improperly brought to the jury's attention. "[I]nformation is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014). "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.* "[J]uror conduct during deliberations," such as the consumption of alcohol, *Tanner v. United States*, 483

21

U.S. 107, 125–26 (1987), and statements made during deliberations, including statements calling into question a juror's objectivity, *Warger*, 135 S. Ct. at 529, have been deemed internal matters.

Based on the above precedent, we have no doubt that the juror's note in question concerns purely internal matters.    It states that the other jurors "overwhelmingly bullied [her] into focusing on only the [government's] evidence," "guided [her] into disregarding all the evidence" that supported Foster's case, and used their "age" and "occupational eliteness" as "swaying tactics" during deliberations.  (R. 383, USCA 2201–04)

Such statements lie at the heart of evidence made inadmissible by Rule 606(b) of the Federal Rules of Evidence.  The Rule excludes evidence regarding "any statement made or incident that occurred during the jury's deliberations," its "effect . . . on that juror's . . . vote," and "any juror's mental processes concerning the verdict."  *See also Warger*, 135 S. Ct. at 524 (holding that "Rule 606(b) precludes a party seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*").  A juror's professional experiences, regardless of occupation, are among those expected to enter the jury room.  *Id.*

In any event, the juror's letter describes nothing more than typical features of jury deliberations.  *See United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998)

("Jury deliberations entail delicate negotiations where majority jurors try to sway dissenting jurors in order to reach certain verdicts or sentences.  An individual juror no longer exposed to the dynamic offered by jury deliberations often may question his vote once the jury has been dismissed."); *see also Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 882 (2017) (Alito, J., dissenting) ("A juror who is initially in the minority but is ultimately persuaded by other jurors may have second thoughts after the verdict is announced and may be angry with others on the panel who pressed for unanimity.").  For these reasons, we find no error in the district court's denial of Foster's motion to vacate the verdict because of alleged juror misconduct.

## IV.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.