**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13026

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

FREDERICK ANDRE SPENCER,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:21-cr-00371-CLM-JHE-4

————————————

Before NEWSOM, BRASHER, and BLACK, Circuit Judges.

PER CURIAM:

Frederick Andre Spencer appeals his convictions and sentence to 55 months' imprisonment and order to pay $664,426 in restitution for 2 counts of conspiring to commit wire fraud, 1 count

of making false statements to the Small Business Administration on a loan application, and 1 count of wire fraud.  Spencer presents four issues on appeal, which we address in turn.  After review, we affirm Spencer's convictions, but vacate his sentence and restitution order, and remand for resentencing.

## I.  MOTION TO SEVER

First, Spencer contends the district court erred in denying his motion to sever various charges against codefendant Anthony Lamon Frazier (Counts 1 to 27, 29, and 35 to 37) from the sole charge against Spencer at trial (Count 28),[1] which alleged Spencer and Frazier conspired to commit wire fraud against Q.W.

An indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Additionally, an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," and "[t]he defendants may be charged in one or more counts together or separately."  Fed. R. Crim. P. 8(b).  "[T]o meet the same series of acts or transactions requirement of Rule 8(b), the government must demonstrate that the acts alleged are united by some substantial identity

---

[1] Spencer pleaded guilty before trial to Counts 30, 33, and 34.  Those counts were for wire fraud and false statements related to Paycheck Protection Program loans.

of facts and/or participants." *United States v. Wilson*, 894 F.2d 1245, 1253 (11th Cir. 1990) (quotation marks omitted). "Each participant need not have been involved in every phase of the venture, however, and each participant need not know each of the other participants' roles and identities." *Id.* Additionally, "[s]eparate conspiracies with different memberships may . . . be joined if they are part of the same series of acts or transactions." *United States v. Weaver*, 905 F.2d 1466, 1476 (11th Cir. 1990).

Improper joinder under Rule 8 does not require reversal where the misjoinder was harmless error. *Id.* at 1477. "[I]mproper joinder is harmless unless it results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quotation marks omitted). In conducting this analysis, we must look beyond the indictment to the trial evidence, *id.*, and we must consider whether there was a reasonable chance the jury might not have convicted the defendant had the trial been severed, *United States v. Watson*, 866 F.2d 381, 385 (11th Cir. 1989). "[I]t is presumed that cautionary instructions to the jury to consider the evidence separate as to each defendant will adequately guard against prejudice." *United States v. Leavitt*, 878 F.2d 1329, 1340 (11th Cir. 1989). In many cases, we may "simply look[] to the prejudice component of the defendant's claim and only in the rare case where the defendant has demonstrated prejudice will the court be required to address the issue of whether the joinder was actually proper." *United States v. Morales*, 868 F.2d 1562, 1567 n.3 (11th Cir. 1989).

Based solely on the face of the indictment, Count 29 was properly joined with Count 28 because the proceeds that Frazier allegedly laundered in Count 29 were the proceeds of the Count 28 wire fraud conspiracy against Q.W.  Consequently, Count 29 arose from the "same series of acts or transactions" as Count 28 because the charges were united by a substantial identity of facts. *See Wilson*, 894 F.2d at 1253.

Even assuming, *arguendo*, the district court erred in allowing the joinder of Counts 1 to 27 and 35 to 37 with Count 28 under Rule 8, Spencer has failed to show this error caused him to suffer "actual prejudice" due to a "substantial and injurious effect or influence in determining the jury's verdict."  *See Weaver*, 905 F.2d at 1477; *see also Morales*, 868 F.2d at 1567 n.3.

First, the court repeatedly cautioned the jury it had to "consider each crime and the evidence relating to it separately and individually" and that it had to "consider the case for Mr. Frazier and Mr. Spencer separately and individually" as to Count 28.  This Court must presume the court's cautionary instructions to consider the evidence separate as to each defendant adequately guarded against prejudice, and Spencer has failed to overcome this presumption.  *See Leavitt*, 878 F.2d at 1340.  Contrary to Spencer's argument that evidence of Frazier's previous conviction of drug distribution implied that anyone connected to Frazier was likely guilty themselves, none of the evidence of Frazier's drug distribution implicated Spencer, and the evidence was dissimilar from the evidence supporting the Count 28 charge to defraud Q.W.  *Cf.*

*United States v. Prosperi*, 201 F.3d 1335, 1346 (11th Cir. 2000) (noting the risk of prejudicial spillover is lower where the evidence supporting each count is dissimilar).

Second, Spencer has failed to show a reasonable probability the jury would not have convicted him of Count 28 in a severed trial. *See Watson*, 866 F.2d at 385. Absent the evidence of Frazier's drug money laundering, structuring financial transactions, and false tax returns, the trial evidence still showed strong evidence that Spencer conspired with Frazier to commit wire fraud against Q.W. as detailed in Issue II, and Spencer has not adequately explained why, considering this evidence, there is a reasonable probability that a jury would not have found him guilty at a severed trial.

For similar reasons, we also conclude Spencer has failed to show "compelling prejudice" from the district court's denial of his motion to sever under Rule 14. *See United States v. Mosquera*, 886 F.3d 1032, 1041 (11th Cir. 2018) ("The decision whether to grant a severance lies within the district court's sound and substantial discretion," and "we will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection." (quotation marks omitted)). The court's repeated cautionary instructions mitigated the risk of spillover effects from evidence of Frazier's drug distribution, *see United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006) (stating a limiting instruction will normally mitigate the risk of spillover effects); the evidence supporting Spencer's guilt as to Count 28 was strong, and it was largely dissimilar from

the evidence supporting Counts 1 to 27 and 35 to 27, *see Prosperi*, 201 F.3d at 1346; and the disparity in the amount of evidence presented at trial against Frazier and Spencer, respectively, is insufficient to show compelling prejudice, *see United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) ("A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants."). Further, the jury's brief deliberations and uniform verdict, alone, are insufficient to show Frazier suffered compelling prejudice, particularly since the jury's short deliberations may have simply reflected its view about the strength of the Government's case. *See United States v. Hernandez*, 921 F.2d 1569, 1580 (11th Cir. 1991) (stating relatively short jury deliberations combined with a unanimous jury verdict are insufficient to show compelling prejudice, particularly since they may signal strong evidence).

For these reasons, Spencer's challenges to the district court's denial of his motion to sever fail.

## II. JUDGMENT OF ACQUITTAL

Second, Spencer asserts the district court erred in denying his motion for a judgment of acquittal as to Count 28 because the Government failed to present sufficient evidence that he conspired with Frazier to commit wire fraud against Q.W. It is unlawful for any person who, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire

. . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," and to conspire to do the same.  18 U.S.C. §§ 1343, 1349. To convict a defendant of conspiracy to commit wire fraud, the government must prove (1) a conspiracy to commit wire fraud existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily joined the conspiracy. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019).

Regarding the first element, "the very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (alteration and quotation marks omitted).  "[A] defendant can be convicted of conspiracy if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have direct contact with other alleged co-conspirators, or did not participate in every stage of the conspiracy."  *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015).  Regarding the joining element, "the government can meet this burden through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy."  *Vernon*, 723 F.3d at 1274 (quotation marks omitted).

"[V]iewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility

choices in favor of the jury's verdict," *see United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998), the trial evidence showed the following: (1) Q.W. wired $500,000 to the Head of Game account based on Spencer and Frazier's representations that the money would be used to grow Head of Game; (2) Frazier transferred $214,825 of Q.W.'s funds to a Mom & Son's Towing account—which Spencer's mother opened a day before the transfer—a day after receiving Q.W.'s transfer; (3) Spencer spent Q.W.'s money on personal expenses, including $21,000 for a "[b]obcat, tire[,] [and] motor for [a] truck," (4) Frazier used Q.W.'s money to pay off credit card debt and to flip houses; and (5) Spencer lied to investigators in telling them that Frazier had transferred the money to the Mom & Son's Towing account so that Spencer and a friend could establish a nightclub. This circumstantial evidence was more than sufficient for a jury to find beyond a reasonable doubt that Spencer knowingly and voluntarily participated in a conspiracy with Frazier to commit wire fraud against Q.W. *See Vernon*, 723 F.3d at 1273; *Feldman*, 931 F.3d at 1257.

While Spencer argues there was no evidence he had access to the Head of Game account, Spencer did not need to participate in every stage of the conspiracy, including having control of the Head of Game account, to be convicted of conspiring to commit wire fraud, *see Sosa*, 777 F.3d at 1290. Nor did he need to know the exact way Frazier spent Q.W.'s funds to be convicted of conspiracy, so long as he knew the essential nature of the conspiracy. *See id.* Based on the evidence discussed above, a rational jury could infer that Spencer knew the essential nature of the conspiracy was

to split Q.W.'s funds between himself and Frazier so the two could spend these funds for purposes other than building Head of Game. *See id.* Furthermore, even assuming Spencer spent *some* of Q.W.'s funds in ways that directly or indirectly benefitted Head of Game, this would not preclude a rational jury from finding Spencer guilty of Count 28 based on trial evidence showing he and Frazier misappropriated sizable portions of Q.W.'s funds. While trial evidence showed Q.W. had access to the Head of Game account, the jury could have reasonably inferred that neither Spencer nor Frazier expected Q.W. to closely monitor the account based on Q.W.'s testimony he was close with Spencer, trusted Spencer, and knew little about marketing.

For these reasons, we reject Spencer's challenge to the district court's denial of his motion for a judgment of acquittal.

## III. SENTENCE

Third, Spencer contends the district court erred in calculating the amount of loss his conduct caused Q.W. by failing to credit the value of various items and marketing services that he provided to Q.W. While the district court credited Spencer for work done on securing certain brand marketing deals for Q.W., the court did not credit the cost of other services and goods provided to Q.W. such as producing documentary footage and other promotional videos and materials for Q.W., the cash and gold chain he gave Q.W., and the custom suit he purchased for Q.W. for the NFL Draft. Spencer contends he paid for those expenses using his own money because he did not have access to the Head of Game

account and these expenses were incurred as part of Q.W.'s work to make Head of Game and Q.W. a success.

The PSI's calculation was $664,426 in loss.[2]  Under the 2023 Sentencing Guidelines, a defendant convicted of a crime involving fraud or theft in which the loss was more than $550,000 but not more than $1,500,000 received a 14-level increase to his offense level.  U.S.S.G. § 2B1.1(b)(1) (2023).  If the loss was more than $250,000 but not more than $550,000, the defendant received a 12-level increase to his offense level.  *Id.*  The district court found that, because Spencer's conduct resulted in a baseline loss of $664,426, and because the 14-level enhancement covered $550,000 to $1.5 million in loss, Spencer had to "show a value of at least $114,426 in value returned" to reduce his offense level.  The district court determined that while "Head of Game, particularly Mr. Spencer, did provide some value back"—citing "the Bose contract, the Everett Sports, Nike . . . in conjunction with" Young Money APAA Sports—the value of these services was less than $114,426.

"We will overturn a court's loss calculation under the clear-error standard where we are left with a definite and firm conviction that a mistake has been committed."  *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quotation marks omitted).  "When a defendant challenges one of the factual bases of his sentence . . . the Government has the burden of establishing the disputed fact by

---

[2] This amount consisted of $500,000 in loss related to the Head of Game account, and $164,426 in loss to the Small Business Administration related to Paycheck Protection Program fraud that Spencer pleaded guilty to before trial.

a preponderance of the evidence." *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995).

The application notes to the 2023 version of § 2B1.1 provided the "[l]oss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *Id.*, comment. (n.3(E)(i)) (2023).[3] "This credit accounts for the fact that value may be rendered even amid fraudulent conduct," and the relevant inquiry is whether any legitimate value was rendered to the victim. *Campbell*, 765 F.3d at 1302, 1305 (quotation marks omitted). Nonetheless, "a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to conceal or perpetuate his scheme, nor may he deduct the costs he incurred in running a fraudulent scheme." *Id.* at 1302 (citations omitted).

"[T]he appropriate method for estimating loss in any given case is highly fact-dependent, and accordingly, district judges are

---

[3] We held courts "may not defer" to the commentary to the Sentencing Guidelines "if uncertainty does not exist" in the relevant guideline. *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc) (citation modified). However, we have relied on the commentary to a guideline where "[n]o party contest[ed] the commentary's validity . . . or the propriety of its interpretation of [the guideline's] text." *United States v. Jews*, 74 F.4th 1325, 1327 n.2, 1328 (11th Cir. 2023). Because neither party contests the propriety of Application Note 3(E)(i)'s commentary to U.S.S.G. § 2B1.1 (2023), we may rely on this commentary in resolving Spencer's challenge to the district court's calculation of Q.W.'s amount of loss. *See id.*

entitled to considerable leeway in choosing how to go about this task." *Id.* at 1301. To this end, the application notes to § 2B1.1 provide "[t]he court need only make a reasonable estimate of the loss" and that "the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, comment. (n.3(C)) (2023). However, "[t]he district court is not altogether unfettered in calculating the loss amount," and it "must support its loss calculation with reliable and specific evidence." *Campbell*, 765 F.3d at 1301 (quotation marks omitted). "Loss should be measured from the perspective of the victim." *United States v. Foster*, 878 F.3d 1297, 1306 (11th Cir. 2018) (alteration and quotation marks omitted).

The court did not clearly err in finding the amount of "value back" that Spencer and Head of Game provided to Q.W. through the marketing deals with Bose, Everett Sports, and Nike was less than $114,426. *See United States v. Gyetvay*, 149 F.4th 1213, 1239 (11th Cir. 2025) ("We review the procedural reasonableness of a sentence, which includes whether the guideline range was properly calculated, under an abuse-of-discretion standard."); *United States v. Annamalai*, 939 F.3d 1216, 1235 (11th Cir. 2019) (stating in conducting an abuse of discretion review, we review a district court's interpretation of the Sentencing Guidelines de novo and its findings of fact for clear error, including its loss calculations). By Spencer's own testimonial estimates at sentencing, these contracts totaled approximately $102,500 between the $7,500 Bose endorsement, the $25,000 Everett Sports deal, the $10,000 Proctor & Gamble deal, the $25,000 Nike deal, and the $35,000 Hyundai deal. Assuming the fair market value of Head of Game's services rendered to Q.W.

in helping him secure these contracts was equal to the ten percent fee that Head of Game received, these "services rendered" were worth approximately $10,250—far less than the $114,426 threshold needed to lower Spencer's Guidelines range.

Further, it was reasonable for the district court to refuse to credit expenses such as the $50,000 gold chain for Q.W., the $25,000 in cash in a Louis Vuitton bag, the $2,500 in cash after the Atlanta meeting, and the cost of airline tickets because the district court could have reasonably found these expenses fell beyond the scope of the services that Spencer and Head of Game were supposed to perform in connection to Q.W.'s $500,000 transfer. Indeed, several of these expenses—including the gold chain from January 14, 2019, the cash in the Louis Vuitton bag from December 2018, and the $2,500 in cash in December 2018—were incurred prior to the January 15, 2019, transfer of $500,000 to the Head of Game account, and Q.W. testified his funds were not supposed to cover expenses incurred before the transfer.

Nonetheless, the district court provided no explanation as to why Spencer should receive credit for assisting Q.W. in securing marketing deals but not for his work in producing marketing videos for Q.W., even though both services fell within the scope of the work that Head of Game was supposed to perform. By Spencer's estimates, the fair market value of these videos potentially exceeded the $114,426 threshold based on their costs of approximately $30,000, $90,000, and $150,000, and the court did not make any factual finding that Spencer's estimates of the costs of these

videos were inflated or that Q.W. did not derive any value from these videos. *See Campbell*, 765 F.3d at 1301 (explaining a district court must support its loss calculation with reliable and specific evidence). In other words, the court adequately explained why some benefits counted and why others did not, but it was silent as to evidence of other benefits that reasonably could have counted and would have altered the offense level. *See id.*

Based on the court's comments regarding other expenses Spencer incurred, it is likely the court, at least in part, reasoned the marketing videos could not be credited as services rendered to Q.W. because Spencer paid for these videos using funds from his own personal bank account rather than the Head of Game account. But we find no requirement the value Spencer provided to Q.W. need to be funded using only Q.W.'s money, and nowhere does the text of Application Note 3(E)(i) state the value of the "services rendered" to the victim may be funded only through the money the victim supplied. *See* U.S.S.G.§ 2B1.1., comment. (n.3(E)(i) (2023).

Instead, the relevant inquiry is whether, from Q.W.'s perspective, "[Spencer] or other persons acting jointly with [him]" provided value that offset Q.W.'s $500,000 transfer—not how Spencer paid for this value. *See Foster*, 878 F.3d at 1306; U.S.S.G. § 2B1.1, comment. (n.3(E)(i) (2023). Thus, if the marketing videos fell within the scope of services that Spencer and Head of Game were supposed to perform in connection to Q.W.'s $500,000 transfer, Spencer should have received credit for these videos, regardless of

how he paid for them. *See* U.S.S.G.§ 2B1.1., comment. (n.3(E)(i) (2023). The same could potentially be said of the custom suit Spencer purchased for Q.W. to wear to the NFL Draft. Spencer's purchase of a suit for Q.W. to wear to the NFL Draft—a highly public event with large marketing potential—fell within the scope of the marketing services that Head of Game was supposed to provide for Q.W., yet the court excluded the suit because Spencer used "his own personal money" to purchase it.

Alternatively, rather than excluding the marketing videos and the custom suit because of how they were funded, the district court may have refused to credit these items because it believed they were not "attributable to something that Head of Game did." However, if this was the court's rationale, it remains unclear why the court credited the marketing deals but not the marketing videos and the custom suit, since all these expenses fell within the scope of the services Spencer and Head of Game were supposed to perform, and these services provided value to Q.W.

We conclude the district court abused its discretion in determining which of Spencer's expenses were ineligible for credit against the amount of Q.W.'s loss under Application Note 3(E)(i). Because the district court did not provide an adequate explanation as to why it was crediting Spencer for the value of the marketing deals but not the marketing videos and the custom suit, and crediting those other services could have reduced Spencer's offense level, we vacate the district court's calculation of Q.W.'s amount of loss and remand for resentencing.

## IV. RESTITUTION

Spencer asserts the district court erred in ordering him to pay $500,000 in restitution to Q.W. "A district court has authority to order restitution only as authorized by statute." *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013). The Mandatory Victims Restitution Act requires a district court to grant restitution to all victims of certain enumerated categories of offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1). These offenses include, among others, "an offense against property" under Title 18, "including any offense committed by fraud or deceit." *Id.* § 3663A(c)(1)(A)(ii). Under the Victim and Witness Protection Act, district courts have the discretion to order restitution to victims of certain enumerated offenses, including offenses under Title 18. 18 U.S.C. § 3663(a)(1)(A).

"The purpose of restitution is not to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Young*, 108 F.4th 1307, 1319 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 1959 (2025) (quotation marks omitted). To this end, "a court must base the amount of restitution awarded to the victim on the amount of loss that the defendant's conduct *actually* caused," and it "must account for any value that a defendant's scheme bestowed on the victim." *Id.* at 1319–20 (citation modified).

Because we determined the district court abused its discretion in calculating Q.W.'s amount of loss, we vacate the district

court's restitution order so it may ensure the amount of restitution reflects the amount of loss that Spencer's conduct actually caused. Even had the court not abused its discretion in calculating Q.W.'s amount of loss, we would still vacate the restitution order because it clearly erred in failing to account for any of the value the district court found that Spencer provided back to Q.W. *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011) (stating we review for clear error the factual findings underpinning a restitution order).

## V.  CONCLUSION

We **AFFIRM** Spencer's convictions, **VACATE** his sentence and the restitution order, and **REMAND** for resentencing.